### 2003 UT 50

## GREEN RIVER CANAL COMPANY, Plaintiff, Appellee and Cross–Appellant,

v.

### Lee THAYN, Defendant, Appellant, and Cross–Appellee.

No. 20010357.

Supreme Court of Utah.

Nov. 7, 2003.

Rehearing Denied Dec. 18, 2003.

J. Craig Smith, David B. Hartvigsen, D. Scott Crook, Scott M. Ellsworth, Salt Lake City, for plaintiff.

Steven A. Wuthrich, Montpelier, Idaho, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 Plaintiff Green River Canal Company (GRCC) and Defendant Lee Thayn (Thayn) both own and operate irrigation canals in Green River, Utah. GRCC alleges that Thayn breached agreements made by the parties in 1952 to govern their shared use of certain water diversion facilities owned by Green River when Thayn built and began operating a small hydroelectric power generation facility that used water in excess of the amounts mentioned in the 1952 agreements. The trial court ruled in favor of GRCC, holding that the 1952 agreements are determinative as to both the amount of water each party is entitled to divert through the facilities and the uses to which that water is put. The principal issue before us is whether the 1952 agreements impose a fixed limitation on the amount the parties are entitled to divert through the facilities, or whether the agreement merely describes the parties' 1952 water rights and does not preclude a change in the amount of water diverted through the facilities or a change in the water's use.

## BACKGROUND

¶ 2 Approximately six miles north of the City of Green River, Utah, is a crescent-shaped dam that spans the width of the Green River and channels water through certain water diversion facilities and into the parties' irrigation canals. GRCC is a non-profit, mutual water company. In the 1880's, GRCC built an eight-and-a-half mile canal to serve its shareholders. Thayn is the successor-in-interest to a farm and appurtenant water rights purchased from Wilson Produce Company (Wilson) under a 1979 contract. In 1933, in order to irrigate the farmland, Wilson constructed a canal that is approximately forty-two (42) feet higher in elevation than, and parallel to, GRCC's canal. To pump the water up to his canal, Wilson remodeled a small, old, hydroelectric facility once owned by Green River City that sat between GRCC's canal and the river. This building and facility, known as the pump house or powerhouse, delivers water from the pump house up into the canal.

¶ 3 Before the parties' water reaches the pumphouse or their canals, the water must first pass through a series of shared water diversion facilities. In addition to the dam across the Green River, the diversion facilities consist of a 40–foot–wide, 2,500–foot–long, unlined canal known as the "raceway." Water that is diverted from the dam flows in a southerly direction down the raceway through a set of "control gates" that can be utilized to restrict the flow of water for maintenance and repair on the raceway. Water then continues to the foot of the raceway where GRCC's canal carries the flow south to its shareholders. Thayn's pump house is located perpendicular to, and abutting the east side of GRCC's canal inlet. All of the water in the raceway that does not flow down GRCC's canal goes under the pump house through a set of turbines or to Thayn's irrigation pumps to pump water up to his canal. The pump house is also fitted with a set of "radial gates" that Thayn opens periodically in order to flush silt and sand that has built up in the raceway back into the river. In 1992, Thayn renovated the pump house, upgraded the turbines, and put in a small hydroelectric power generation facility at a cost of approximately $300,000.

¶ 4 GRCC and Thayn (via his predecessor, Wilson) are parties to a 1952 Agreement (the 1952 Agreement) that sets out their rights and interests with respect to the ownership and use of these diversion facilities. First, the 1952 Agreement establishes that GRCC

owns the dam, the raceway, and the area surrounding the pumphouse parcel, and that Thayn [1] owns the pumphouse parcel itself and a parcel at the head of his canal. Second, the 1952 Agreement establishes a scheme for joint maintenance of the diversion works. While GRCC maintains ownership over the diverting works, Thayn is obligated both to receive all of his water through GRCC's facilities and to pay one-half of the cost of mutual maintenance and upkeep of the dam. Thayn remains responsible for any other expenses for "repair of the raceway, pits and diversion works" that are made on his own initiative. Third, the 1952 Agreement gives each party the right to enter the property of the other "in connection with the reasonable use to be made by each party of the land [at issue]." Fourth, and most importantly for this case, the 1952 Agreement also establishes the priority of water rights for each party. Specifically, paragraph six of the 1952 Agreement states:

It is understood and agreed that before [Thayn] can or may use any water from said dam, diverting works or race way that [GRCC] shall have enough and sufficient water to supply its stockholders. The quantity of water to supply [GRCC's] stockholders is to be exclusively determined by GRCC.

The 1952 Agreement does not make any reference to the parties' claims to use specific quantities of water.

¶ 5 In order to clarify the meaning of paragraph six, on September 30, 1952, GRCC and Wilson executed an amendment to the Agreement (the 1952 Amendment), which addresses the quantities of water that could be diverted by each party.[2] Specifically, the 1952 Amendment states that GRCC is entitled to 20 cubic feet per second (cfs) year-round for stock watering, and an additional 60 cfs during the irrigation season for a total of 80 cfs. Under the 1952 Agreement, Thayn, through his predecessor Wilson, claims 35 cfs for irrigation purposes and an additional 400 cfs to drive the mechanical pumps needed to deliver water to his canal. The principal issue in dispute here is whether these water claims establish fixed limits on the amounts the parties can divert, or if they merely describe the water rights the parties were claiming in 1952.

¶ 6 The parties' water rights have changed substantially since the 1952 Agreement and Amendment were signed. At the time of the agreements, GRCC's water right was based on an 1881 diligence claim to appropriate 20 cfs year-round for stock watering, and 60 cfs for seasonal irrigation and domestic uses, for a maximum total of 80 cfs. However, in 1974 the State Engineer determined, pursuant to a proposed determination for general adjudication of water rights in the surrounding drainage area, that the amount of GRCC's actual need during the irrigation season is only 60 cfs. The State Engineer has determined that this 60 cfs is inclusive of GRCC's 20 cfs year-round stock watering right, for a maximum of 60, not 80, cfs.

1. While Wilson was the original party to the 1952 Agreement and Amendment, Thayn's name is used primarily throughout this opinion to reflect that he is Wilson's successor-in-interest and the party whose rights are in dispute in this case. However, reference is made to Wilson when discussing facts specific to the situation in 1952.

2. In its entirety, the single relevant paragraph of the 1952 Amendment states:

That the meaning of paragraph 6 of said original agreement [the 1952 Agreement] was intended to be that [GRCC] should have a priority of diversion, and should be entitled to take whatever water should be needed by the said first party or its stockholders before [Thayn] should be entitled to divert any water through or over the dam and diversion works; and that the quantity of water needed should also exclu-

sively be determined by [GRCC]. However, it was and is also mutually understood and agreed that [GRCC] claims for the uses of its stockholders 80 second feet of water as particularly set forth in that certain diligence claim No. 46 on file and of record in the office of the State Engineer of the State of Utah and that after said rights are satisfied through diversion at said dam and diverting works that the water rights of [Thayn] as set forth in its water filing about to be issued by said State Engineer for 35 second feet of water for irrigation uses upon approximately 1,325 acres of land, as well as its filings for power purposes to pump said water not to exceed 400 second feet or such lesser amounts as may be approved by the State Engineer of the State of Utah shall then be satisfied through diversions at said dam and diverting works before any other or additional diversions are made by [GRCC].

¶ 7 For Thayn's part, the 1952 Amendment does not describe his current water rights either. Wilson's water right in the 1952 Amendment included appropriation of 35 cfs for irrigation and 400 cfs to drive his mechanical pumps. However, these rights had changed substantially by 1981 when Thayn closed on the Wilson property. In 1975 Wilson obtained the right to pump 600 cfs for power during the irrigation season. In 1981, at Thayn's request, Wilson also filed a change application with the State Engineer and received permission to use the 600 cfs to generate power year-round. Thus, notwithstanding the terms of the 1952 Agreement and Amendment, the State Engineer has determined that Thayn is entitled to 35 cfs for irrigation and an additional 600 cfs to generate hydroelectric power, and no objection to that determination has been filed, thus creating a presumptive right under our statutes. *See United States Fuel Company v. Huntington–Cleveland Irrigation Co.*, 2003 UT 49, ¶¶ 17–18, 79 P.3d 945.

¶ 8 In 1987, Thayn received approval from the Federal Energy Regulatory Commission (FERC) to develop a hydroelectric power generation project using his 600 cfs water right. Thayn rebuilt the old pumphouse to generate hydroelectric power and the new facility went online in May 1992. GRCC alleges that as soon as Thayn's facility was brought online and began producing hydroelectric power, GRCC began having water shortages and problems with water flow fluctuations that impeded its shareholders' access to their water.

¶ 9 On April 28, 1995, GRCC gave notice of default of the 1952 Agreement to Thayn. GRCC asserted that besides disrupting GRCC's use of its prior water rights, Thayn has realized economic gain from the commercial sale of electrical power generated by the water diverted and conveyed by GRCC's diversion and distribution facilities, but has refused to compensate GRCC for the additional and unauthorized use of GRCC's diversion works and water distribution facilities to generate that economic gain.

¶ 10 In June 1995, GRCC instituted this action against Thayn, alleging, among other claims, (1) breach of contract for utilizing the diversion works in excess of the 1952 Agreement and Amendment, (2) equitable relief for loss of profits, and (3) seeking an injunction to prevent Thayn from operating the hydroelectric facility. Thayn answered and counterclaimed, denying that GRCC's interpretation of the 1952 Agreement and Amendment precluded his use of the water right for power generation. As affirmative defenses, Thayn argued that the real nature of the breach of contract and injunction claims was not for recovery of damages, but was an attempt to extort profits from Thayn. Additionally, Thayn argued that GRCC had an adequate remedy at law if in fact any damages really occurred and raised the defenses of laches, estoppel and waiver. Thayn also counterclaimed for his attorney fees and costs.

¶ 11 On June 28, 1996, Thayn filed a motion for summary judgment. Thayn argued that the 1952 Agreement was merely "descriptive" of the parties' respective water rights and did not preclude any future water rights or usages that might arise. Thayn also asserted laches, estoppel and waiver as grounds for summary judgment, contending that GRCC was aware of Thayn's plans to develop hydroelectric power, but never objected to those plans. GRCC filed its own motion for summary judgment on June 28, 1996, asserting that the 1952 Agreement and Amendment embody enforceable quantitative limits on each party's water rights. GRCC also sought injunctive relief and specific performance of the 1952 Agreement.

¶ 12 The trial court entered summary judgment for GRCC on the breach of contract issue, ruling that the 1952 Agreement and Amendment were unambiguous, certain, definite and enforceable and explicitly limited Thayn to diversion of 35 cfs for irrigation and 400 cfs for power generation to pump the water for irrigation. The trial court further stated that the 1952 Agreement and Amendment were intended to settle the question of each party's rights for all time and did not contemplate an enlargement of Thayn's 435 cfs water right. However, the trial court held that there were disputed issues of material fact regarding Thayn's affirmative defenses of laches, estoppel, and waiver that

precluded summary judgment for GRCC. With respect to the claims for specific enforcement of the 1952 Agreement and Amendment and the injunction, the trial court held that an injunction was proper since there were only nominal damages to GRCC and that any damages actually suffered would be impossible to prove. These rulings were to take effect after the trial on the issues of estoppel, waiver, and laches.

¶ 13 Thayn then filed an application for temporary restraining order and a motion for a preliminary injunction in an attempt to prohibit GRCC from constructing a 40–foot wall extending out from its canal and into the raceway, adjacent to and in front of Thayn's pump house. Thayn alleged that the wall would impede or block the flow of water to the pump house. The temporary restraining order was granted, but was subsequently dissolved after an evidentiary hearing on the preliminary injunction motion. The trial court denied the preliminary injunction and dissolved the temporary restraining order because Thayn could not demonstrate that he would suffer irreparable harm since any harm from the wall would be compensable through monetary damages. Furthermore, the court held that Thayn did not have a substantial likelihood of prevailing on the merits because Thayn had no counterclaim pending that involved the wall, meaning that Thayn had no underlying claim on which he could prevail. The trial court awarded GRCC its attorney fees for successfully resisting the imposition of the injunction.

¶ 14 Following a ten-day bench trial, the trial court entered its ruling on waiver, laches, and estoppel, finding that Thayn had failed to carry his burden of proof on any of his affirmative defenses. The trial court also entered its rulings on GRCC's claims for equitable relief. The trial court ruled that GRCC owns the dam, raceway, and control gates, and that GRCC has the contractual right to use the first 80 cfs diverted through the canal during irrigation season and the first 20 cfs year-round. The trial court also held that Thayn has the right to use the next 35 cfs for irrigation during the irrigation season and up to 400 cfs during the irrigation season to pump the water up to his canal.

Finally, the trial court ruled that Thayn should be permanently enjoined from using GRCC's diversion facilities for any purpose other than for irrigation and for generating power to pump the water up to his canal unless he obtains the canal company's express written consent and agreement to use the diversion facilities for such purposes. Thayn now appeals the trial court's summary judgment and bench-trial rulings to this court.

¶ 15 On cross-appeal, GRCC argues that the trial court erred in concluding that rule 65A(c)(2) of the Utah Rules of Civil Procedure does not permit the recovery of expenses necessarily incurred in defending against a wrongfully incurred injunction. GRCC also argues that the trial court abused its discretion when it failed to require disgorgement of Thayn's profits and that the trial court erred in finding that the radial sluice gates were appurtenant to the pump house.

## STANDARD OF REVIEW

¶ 16 The trial court's interpretation of a contract presents a question of law, which we review for correctness. *Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 6, 983 P.2d 575. We also review for correctness the trial court's grant of summary judgment pursuant to Utah R. Civ. P. 56(c) and afford no deference to its legal conclusions. *Arnold Indus., Inc. v. Love*, 2002 UT 133, ¶ 11, 63 P.3d 721. In reviewing a decision made on summary judgment, we consider whether the trial court correctly ruled that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Lovendahl v. Jordan Sch. Dist.*, 2002 UT 130, ¶ 13, 63 P.3d 705.

## ANALYSIS

## I. INTERPRETATION OF THE 1952 AGREEMENT AND 1952 AMENDMENT

¶ 17 "The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract." *WebBank v. American Gen. Annuity Svc. Corp.*, 2002 UT 88, ¶ 17, 54 P.3d

1139. When interpreting a contract, "we look to the writing itself to ascertain the parties' intentions, and we consider each contract provision ... in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* at ¶ 18 (quoting *Jones v. ERA Brokers Consol.*, 2000 UT 61, ¶ 12, 6 P.3d 1129). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Id.* at ¶ 19 (quoting *Cent. Fla. Invests., Inc. v. Parkwest Assoc.*, 2002 UT 3, ¶ 12, 40 P.3d 599). In cases concerning the appropriation of water, our decisions favor "insuring the highest possible development and of the most continuous beneficial use of all available water with as little waste as possible." *Wayman v. Murray City*, 23 Utah 2d 97, 458 P.2d 861, 863 (1969); *see also* Utah Code Ann. § 73–1–3 (1989) ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state").

¶ 18 The first and most critical issue we must address is whether the trial court was correct in ruling that Thayn breached the 1952 Agreement and Amendment when he began using his 600 cfs water right to drive his new hydroelectric power facility. In granting summary judgment for GRCC on this question, the trial court ruled that the 1952 agreements were "unambiguous, certain, definite, and enforceable and limit the Defendant's diversion of water to 435 cfs for irrigation and for power generation to pump the water for irrigation." However, after reviewing both the agreements and the record in this case, we have reached the opposite conclusion. We find that the 1952 Agreement and the 1952 Amendment do not, and cannot, impose a fixed limitation on Thayn's right to put the full amount of his state-approved water right to beneficial use when such a limitation would prevent the water from being put to any use at all.

*A.  The References to Specific Water Rights in the 1952 Agreement and Amendment are Descriptive and Not Determinative of the Parties' Rights*

¶ 19 The 1952 Agreement purports to "forever settle and put at rest [the parties'] differences and adopt[s] a permanent plan for the operation of [the] diverting works." To accomplish this goal, the 1952 Agreement fixes the parties' ownership of the diversion facilities and surrounding real property, establishes a scheme for joint maintenance of the diversion works, obligates Thayn to pay one-half the cost of mutual maintenance and upkeep of the dam, grants each party the right to enter the property of the other "in connection with the reasonable use to be made by each party of the land [at issue]," and establishes the priority of water rights for each party. As set forth earlier in this opinion, paragraph six of the Agreement states that "before [Thayn] can or may use any water from said dam, diverting works or race way that [GRCC] shall have enough and sufficient water to supply its stockholders. The quantity of water to supply [GRCC's] stockholders ... is to be exclusively determined by [GRCC]."

¶ 20 The 1952 Amendment aims to "settle the meaning" of paragraph six. First, the Amendment reaffirms that GRCC has the priority of diversion and that GRCC is entitled to take whatever water is "needed" by its stockholders before Thayn is entitled to divert additional water. Second, GRCC maintains the right to decide how much water is "needed." Third, while the Amendment states that GRCC can determine how much water is "needed," the Amendment also states that GRCC only has a claim for the right to use 80 cfs of water. Fourth, the Amendment states that after GRCC's water right is satisfied, that Thayn then has the right to divert that amount of water for which he had filed a claim with the State Engineer; specifically, 35 cfs for irrigating crops, and 400 cfs to drive the mechanical pumps to move the water up to his fields.

■ ¶ 21 The trial court interpreted the 1952 Amendment as fixing permanently the amounts of water the parties were entitled to use in connection with GRCC's diversion facilities. The trial court therefore granted summary judgment to GRCC on the breach of contract issue, holding that GRCC was entitled to 80 cfs and that Thayn's use of 600

cfs to produce hydroelectric power was a breach of the 1952 Amendment. For several reasons, we find the most sound construction of the agreements in this case is to interpret the water claims specified in the 1952 Amendment as merely descriptive of the parties' then-extant water rights, and not as determinative of their current rights.

¶ 22 As a preliminary matter, it is readily apparent, and the parties agree, that paragraph six of the original 1952 Agreement establishes only priorities of water rights and does not fix quantity. Thus, while that initial agreement claims to "forever settle and put at rest" the parties' differences and "adopt a permanent plan" for the operation of the diversion works, such sweeping language cannot itself be construed as the basis for establishing specific quantitative limits on the parties' water rights for the simple reason that no quantities are mentioned in the document. The 1952 Amendment serves to "settle the meaning" of the parties' intention with respect to paragraph six, but what it settles is a question of the scope of GRCC's priority of diversion, not the upper limits of Thayn's future diversion rights.

¶ 23 We believe that the 1952 Amendment simply repaired a glaring omission in the 1952 Agreement, one that seriously jeopardized the access that Wilson, Thayn's predecessor-in-interest, had to his water. Paragraph six of the 1952 Agreement explicitly states that GRCC can take as much water as it deems sufficient, and can unilaterally determine the amounts of water it needs before Wilson can get any water at all. We need not resort to parol evidence to conclude that the purpose of the 1952 Amendment was simply to fix the amount of water GRCC was claiming for its use in order to prevent GRCC, or its successors, from using the broad language of the original 1952 Agreement to claim it was putting to beneficial use all of the water in the raceway—thus denying Thayn access to his water. See Peirce v. Peirce, 2000 UT 7, ¶ 19, 994 P.2d 193 (noting that we construe contracts "so as not to grant one of the parties an absolute and arbitrary right to terminate a contract." (citations omitted)). Absent a fixed upper limit on the amount of GRCC's claim, Wilson had

no guarantee that he could get *any* water into his pumps and up to his canal and his crops. Such a result would have rendered the 1952 Agreement, pursuant to which Wilson deeded significant amounts of real estate to GRCC in exchange for the pumphouse parcel, of no value to him. See id. (noting that "we interpret the terms of a contract in light of the reasonable expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract"); see also Big Cottonwood Lower Canal Co. v. Cook, 73 Utah 383, 274 P. 454 (1929) (construing contract to hold that a landowner was not entitled to take all of the water he wanted so as to entitle grantee only to waste or surplus water permitted to flow off the land).

¶ 24 We find no similar rationale in the 1952 Amendment for permanently fixing Thayn's right at 435 cfs and barring him from making beneficial use of his 635 cfs water right to generate hydroelectric power.

> [W]here there is doubt about the interpretation of a contract, a fair and equitable result will be preferred over a harsh and unreasonable one. And an interpretation that will produce an inequitable result will be adopted only where the contract expressly and unequivocally so provides that there is no other reasonable interpretation to be given it.

Peirce, 2000 UT 7 at ¶ 19, 994 P.2d 193. The recitation of Wilson's water claim in the 1952 Amendment as that "set forth in its water filing" with the State Engineer "not to exceed 400" cfs for mechanical power and 35 cfs for irrigation merely describes the maximum amount of water for which Wilson had theretofore sought state approval, but it does not *create* a fixed water right. "The mere filing of an application does not give the applicant a right to use the water; whatever right or interest exists at that point is inchoate." Little v. Greene & Weed Invs., 839 P.2d 791, 794 (Utah 1992). The Amendment simply contemplates that Wilson could use the full amount for which he had sought state approval, "or such lesser amount as may be approved by the State Engineer." Importantly, the only explicit limitation on the amount Wilson was entitled to divert was to

be determined by the State Engineer, not by GRCC. Nothing in the plain language of the Amendment or in the record suggests that GRCC had bargained for the right to limit Wilson's diversion rights or the use to which he put his water.

¶ 25 The clause in the 1952 Amendment that follows the description of Wilson's water filing explains the reference to the 435 cfs. That clause states that Wilson's water right must be "satisfied through diversions at said dam and diverting works before any other or additional diversions·are made" by GRCC. Thayn's right must be satisfied before GRCC can begin to divert water beyond the amount it claims to "need," that is, 80 cfs. This language ostensibly preserves GRCC's ability to make additional diversions beyond those amounts contained in its diligence claim. However, any such additional appropriations would be in excess of the amount the State Engineer has entitled GRCC to use.[3] It is clear that private parties cannot *create* rights to water simply by contracting to do so, although they may dispose of rights properly acquired by that means. Therefore, this clause cannot be read to impose an upper limit on the amount of water Thayn is entitled to divert. So long as GRCC's prior right to divert the water it "needs" is satisfied (which can be no more than the amount approved by the State Engineer),[4] GRCC has no legal right to make any additional diversions thereafter and thus has no basis to complain about the amount or use of water that continues to flow past the head of its canal. *See Cleary v. Daniels*, 50 Utah 494, 167 P. 820, 823 (1917) (holding that prior appropriator cannot prevent use of surplus waters and cannot prevent another from using water while he cannot use it). To rule otherwise would permit GRCC to trump the appropriation of water for a beneficial use

with the assertion, "If I can't have it, neither can you."

¶ 26 GRCC has no interest in Thayn's water rights that would support a limitation on the amount of water Thayn is entitled to use. Once GRCC receives its water and its requested payments from Thayn for one-half of the cost of joint maintenance of the diversion facilities (and Thayn has paid for his own canal improvements), all of GRCC's rights *in its facilities* have been protected. Indeed, these provisions mark the boundaries of compensable injury in this case because Thayn's contractual obligations have nothing at all to do with either the use or quantity of his water rights. Rather, the 1952 Agreement and Amendment are plainly concerned with establishing a long-term plan that allocates canal maintenance responsibilities to assure each party's initial access to its water. Assuming Thayn meets all of his responsibilities under the Agreement relative to canal upkeep and repair, the actual amount of water he diverts is not GRCC's concern. Nor does GRCC have any right to complain if Thayn changes the use of his water from irrigation to stock watering, domestic uses, or power generation. Whatever interest GRCC has in Thayn's access to his water ends at the foot of the raceway.

¶ 27 GRCC argues that allowing Thayn to divert more water than described in the 1952 Agreement diminishes the value of its canal ownership, which lies in the ability to exclude other users from the use of its facilities. This argument runs contrary to Utah water law, which gives water users the right of eminent domain to share in the use of existing ditches and canals. Utah Code section 73–1–7 gives any person who·wishes to convey water for a beneficial purpose the right "to use or enlarge" any existing canal or ditch, so long as the owner of the ditch is

3. All waters in Utah are subject to appropriation by the State Engineer.

No·appropriation of water may be made and no right to the use thereof initiated and no notice of intent to appropriate shall be recognized except application for appropriation first be made to the State Engineer in the manner hereinafter provided, and not otherwise.

Utah Code Ann. § 73–3–1 (1989 & Supp.2002).

4. We are cognizant, of course, that the State Engineer's determinations are necessarily subject to the powers of the courts to review them when a timely objection is filed pursuant to Utah Code Ann. § 73–4–11. *See United States Fuel Co. v. Huntington–Cleveland Irrigation Co.*, 2003 UT 49, ¶ 15, 79 P.3d 945. No such objections were filed in this matter, and Thayn's rights thus become mandatory pursuant to the operation of the statute. Utah Code Ann. § 73–4–12 (1989).

appropriately compensated for such use. Utah Code Ann. § 73–1–7 (1989).[5] GRCC argues that the existence of a private agreement renders the statute inapplicable because the statute only controls in the absence of a private agreement. *See Gunnison–Fayette Canal Co. v. Roberts,* 12 Utah 2d 153, 364 P.2d 103, 105 (1961); *Peterson v. Sevier Valley Canal Co.,* 107 Utah 45, 151 P.2d 477, 479 (1944); *West Union Canal Co. v. Thornley,* 64 Utah 77, 228 P. 199, 200 (1924) These cases, however, only explain the effect of a private agreement on a canal owner's right to obtain compensation for maintenance or usage of a ditch or canal. Because a canal owner is entitled to compensation under either section 73–1–7 or a private contract, none of these cases undermine the proposition that the right to exclude others is not a benefit of canal ownership.[6] "If ... the parties cannot agree on the price to be paid for the use, the ditch owner can close the ditch against the other party's water until he gets his price or such party enters the ditch under eminent domain." *Peterson,* 151 P.2d at 479. GRCC is entitled to compensation for the use of its diversion facilities, but it has no inherent right to keep Thayn or others from using those facilities.

### B. The Benchmark of the Parties' Water Rights Is Their State–Approved Rights to Put Water to Beneficial Use

■ ¶ 28 The right to use water in Utah has been governed by statute since 1888. *See Little,* 839 P.2d at 794 (citing Compiled Laws of Utah 1888, vol. 2, ch. 2). Until 1903, water rights were established upon the filing of a diligence claim, a claim based on the historical appropriation of water toward a beneficial use. *Id.* In 1903, the legislature began to codify the application and certification procedures for the acquisition of water

rights, and also declared for the first time that all natural waters of the state are public property. *Id.;* Utah Code Ann. § 73–1–1 (1989 & Supp.2002) (declaring "all waters ... to be the property of the public"). "Public ownership is the basis upon which the state regulates the use of water for the benefit and well-being of the people." *J.J.N.P. Co. v. State,* 655 P.2d 1133, 1136 (Utah 1982). Our obligation is to ensure that water is put to the most beneficial use. "[I]t is essential that putting water to the highest and best beneficial use should not only be encouraged, but carefully safeguarded." *Fairfield Irrig. Co. v. White,* 18 Utah 2d 93, 416 P.2d 641, 644 (Utah 1966). Both the statutory framework behind our water laws and the principle of beneficial use on which they are based are integral to the decision we reach today.

1. Role of the State Engineer and the General Adjudication in Determining the Parties' Rights

¶ 29 The legislature created the office of the State Engineer "to keep records of all established water rights and those to be acquired in the future, to supervise the distribution of the water, and to keep records of and regulate future appropriations and changes in the place of diversion, use and nature of the use." *United States v. District Court, Utah,* 121 Utah 1, 238 P.2d 1132, 1134 (1951); *see also* Utah Code Ann. § 73–2–1 (1989 & Supp.2002) (identifying responsibilities of the State Engineer). Due to the scarcity of water resources in our state, appropriation of water is tightly controlled and the State Engineer oversees each step in the application and appropriation process. No person has a right to appropriate or use water in this state without approval from the State Engineer. Utah Code Ann. § 73–3–1 (1989 & Supp.2002). When the appropriation

---

5. GRCC argues that the reference to an existing "canal or ditch" precludes the use of other diversion facilities, such as the dam it owns. We note only that the dam in this case is completely passive and Thayn does not seek to alter it, but merely to use the water that the dam already diverts. Furthermore, in *Salt Lake City v. East Jordan Irrigation Co.,* 40 Utah 126, 121 P. 592, 598 (1911), we held, under the statute preceding section 73–1–7, that compensation could be obtained for damages associated with "diverting

appliances," such as those used to "divert[ ] and distribut[e] water."

6. In light of our holding that Thayn is entitled to use the full amount of his state-approved water right, we need not also rule on Thayn's argument that section 73–1–7 provides an independent basis for his use of that right. We cite the statute here only to address GRCC's contention that the right to exclude others is a benefit of canal ownership.

of water rights is in dispute, the State Engineer can initiate a general adjudication of water rights by filing an action in district court to determine the various rights of water users. *Id.* § 73-4-1. After investigating the various claims, the State Engineer submits a "proposed determination" of the parties' rights to the district court for its consideration in ruling on the general adjudication. *Id.* § 73-4-11.

[17, 18] ¶ 30 Of course, "[t]he State Engineer is an executive, not a judicial officer," *East Bench Irrig. Co. v. State,* 5 Utah 2d 235, 300 P.2d 603, 606 (1956), and the State Engineer's decisions are not binding on the courts of this state. *Id.* The State Engineer acts in an administrative capacity and does not have authority to adjudicate the rights of water users. *Whitmore v. Murray City,* 107 Utah 445, 154 P.2d 748, 750 (1944). However, while the State Engineer's decisions are generally not binding on the courts, the State Engineer's decisions in a general adjudication or pursuant to a proposed determination are binding upon the parties unless and until a party files a timely objection to the proposed determination. Utah Code Ann. § 73-4-11 (1989 & Supp.2002); *United States Fuel Co. v. Huntington–Cleveland Irrigation Co.,* 2003 UT 49, ¶ 15, 79 P.3d 945.

▇▇▇▇ ¶ 31 The State Engineer has determined, pursuant to a 1974 proposed determination of the general adjudication of all water rights in the lower Green River drainage,[7] that 60 cfs, rather than 80 cfs is suffi-

cient to meet the needs of GRCC's stock holders during the irrigation season.[8] Therefore, we must resolve the tension between the amount of GRCC's actual "need" as determined by the State Engineer and the amount of its claim in the 1952 Amendment. "[A] court must attempt to construe the contract so as to 'harmonize and give effect to all of [its] provisions.'" *Dixon v. Pro Image,* 1999 UT 89, ¶ 14, 987 P.2d 48 (quoting *Nielsen v. O'Reilly,* 848 P.2d 664, 665 (Utah 1993)). In interpreting these provisions, we must bear in mind that the State Engineer's role is to determine the actual needs of water users. Utah Code Ann. § 73-2-1 (1989 & Supp.2002). Moreover, we must also recognize that the State Engineer has "special training in the operation and control of natural streams and irrigation and other artificial use and control of water and water rights" and that "he is especially qualified to understand the facts involved in these problems." *East Bench Irrig. Co.,* 300 P.2d at 606.

¶ 32 In this case, the State Engineer's proposed determination is controlling over the parties' water rights descriptions in the 1952 Amendment because GRCC has never filed an objection to the proposed determination; it, therefore, cannot collaterally attack that determination in this lawsuit. *See United States Fuel,* 2003 UT 49 at ¶ 20, 79 P.3d 945. Indeed, the record shows that GRCC has long acquiesced in the State Engineer's proposed determination. Under section 73-4-11, timely objections to decisions of the State Engineer are to be made within ninety

---

7. In 1974, the State Engineer issued a proposed determination as part of the ongoing general adjudication of the Price River and lower Green River drainage. *See In the Matter of the General Determination of Rights to the Use of Water, Both Surface and Underground, Within the Drainage Area of the Green River from the Confluence of the Price and Green Rivers to the Confluence of the Green and Colorado Rivers Excluding the Drainage Area of the San Rafael River in Utah,* Civil No. 690708598, in the Seventh Judicial District Court in and for Carbon County, State of Utah, Judge Bruce K. Halliday. In its proposed determination, the State Engineer determined that GRCC was entitled to only 60 cfs during the irrigation season, rather than the 80 cfs it had filed pursuant to its diligence claim.

8. GRCC vigorously argues that Thayn failed to make the argument below that the State Engineer has approved its use of only 60 cfs, rather

than 80 cfs. GRCC is correct, and Thayn's counsel erred in not discovering and introducing this fact before the trial court. Nevertheless, we can take judicial notice of the State Engineer's proposed determination and proceed with our decision. *Lehi Irrig. Co. v. Jones,* 115 Utah 136, 202 P.2d 892, 895 (1949) (holding that failure to introduce State Engineer's records into evidence was "immaterial" since "judicial notice may be taken of these documents as public records"); *McGarry v. Thompson,* 114 Utah 442, 201 P.2d 288, 291 (1948) (holding that "[s]ince the records of the State Engineer's office are public records, we [may] take judicial notice thereof"); *State Board of Land Comm'rs v. Ririe,* 56 Utah 213, 190 P. 59, 62 (1920) (noting that the court is authorized to take judicial notice of public records of offices of executive branch of government).

days of the issuance of the proposed determination. Utah Code Ann. § 73–4–11. While GRCC has recently asked the State Engineer to modify the proposed determination, this request was denied. In a letter directed to GRCC's counsel, the Attorney General, speaking on behalf of that office and the State Engineer, noted that 60 cfs was "apparently not a problem [for GRCC] when the proposed determination was issued," ... "and it is sufficient now for [GRCC'S] described beneficial uses."

¶ 33 Recognizing that the State Engineer's proposed determination is controlling as to the amount of water GRCC can properly claim in the 1952 Amendment amounts to persuasive evidence that the 1952 Amendment merely describes the parties' water rights. At this point in time, the State Engineer has determined that GRCC's water right is 60 cfs and Thayn's is 635 cfs. To construe the contract to reduce Thayn's right would be as illogical as to construe it to expand GRCC's, particularly since GRCC gets its water first and has no right to use any more. Given that limitation, if Thayn cannot use his water, it would be wasted. We will not interpret the contract to yield such inequitable results. See Peirce v. Peirce, 2000 UT 7, ¶ 19, 994 P.2d 193 (holding that absent express contractual language an equitable interpretation of a contract is preferred over an inequitable or unreasonable one). Thus, in light of the State Engineer's decision, we hold that the quantities mentioned in the 1952 Amendment do not set the upper limits of the parties' water rights because the amounts mentioned therein do not reflect the amounts of water that the parties currently "need" and can put to beneficial use, i.e., the amounts to which they are lawfully entitled by the decision of the State Engineer, to which no timely objection has been filed.

2. Principles of Beneficial Use Support Thayn's Use of His 600 cfs Power Generation Right

¶ 34 Water is a resource of inestimable value to our state and we have likened "a drop of water [to] a drop of gold."

Longley v. Leucadia Fin. Corp., 2000 UT 69, ¶ 15, 9 P.3d 762 (quoting Carbon Canal Co. v. Sanpete Water Users Ass'n, 19 Utah 2d 6, 425 P.2d 405, 407 (1967)). Thus, the guiding principle behind our water law statutes and the work of the State Engineer is that water must always be put to the most beneficial use.

Because of the vital importance of water in this arid region both our statutory and decisional law have been fashioned in recognition of the desirability and of the necessity of insuring the highest possible development and of the most continuous beneficial use of all available water with as little waste as possible.

Wayman v. Murray City Corp., 23 Utah 2d 97, 458 P.2d 861, 863 (1969). A water user's appropriations are limited to the amount that can be put to beneficial use. "No one can acquire the right to use more water than is necessary, with reasonable efficiency, to satisfy his beneficial requirements." McNaughton v. Eaton, 121 Utah 394, 242 P.2d 570, 572 (1952). This is true "regardless of the quantity [of water] that has been used for [past] purposes and the length of time it may have been used." Big Cottonwood Tanner Ditch Co., 164 P. at 859 (Utah 1916).

¶ 35 The principle of beneficial use supports the decision we reach today. Thayn enjoys a state-approved right to divert 600 cfs to generate hydroelectric power. We have concluded that the contract does not restrict Thayn to the use of only 435 cfs to pump irrigation water, and allowing him to use his water rights to generate hydroelectric power ensures that our water is put to the highest and best use. Indeed, our water statutes specifically list "power development" as a beneficial use for water resources. Utah Code Ann. § 73–3–8(1) (1989 & Supp. 2002). GRCC argues that the 1952 Amendment does not prevent Thayn from using his 600 cfs, only that he must find a means to divert his water other than by using GRCC's diversion works for any amounts above 435 cfs. However, the 1952 Agreement explicitly requires that Thayn's water "must be diverted" through GRCC's diversion facilities.[9]

9. The 1952 Agreement requires Thayn to use the

diversion works in order to guarantee that GRCC

Thus, if Thayn did *not* use GRCC's facilities to divert his water, he would be in explicit breach of the 1952 Agreement. Similarly, Thayn could never put the whole of his 600 cfs toward power generation because GRCC's interpretation of the 1952 Amendment precludes any use other than pumping irrigation water, the use mentioned therein. We find that the 1952 Amendment does not impose such unreasonable restraints in outright conflict with the beneficial use doctrine.

¶ 36 GRCC's construction of the 1952 Amendment runs contrary to beneficial use principles and would result in tremendous waste: GRCC would be permitted to take much more water than it needs and is entitled to while preventing Thayn from using all of the water that he has a right to put to a beneficial use. In *Cleary v. Daniels*, 50 Utah 494, 167 P. 820, 823 (1917) we rejected such a result, ruling that the holder of a prior water right "cannot prevent another from using the water during the period of time that he cannot use it, or make it available for use. While ... he retains his right to the water, ... he may not insist that the water be wasted merely because he has a prior right to use it." The existence of the 1952 Agreement and Amendment do not alter this conclusion. Those documents establish priorities of use and resolve issues of facility ownership and canal maintenance. They do not give GRCC the unilateral right to control the amount or use of Thayn's water.

¶ 37 So long as GRCC gets its water (either 20 cfs during the non-irrigation season, or 60 cfs during the irrigation season), we see no reason to prevent Thayn from putting to beneficial use the water that will nevertheless continue to flow down the raceway, without causing any harm to GRCC. Regardless of the parties' past contentions about the

capacity of the raceway, the record reveals that the dam was diverting the same amount of water when Thayn began operating his hydroelectric facility as when Wilson signed the 1952 Agreement and there has always been enough water for both parties. The flow measurements taken by the parties reveal that, when properly maintained, the raceway has ample capacity to satisfy the needs of both water users.[10] Because we find that Thayn did not breach the contract, we need not address the other contractual issues Thayn also raises on appeal.

## II. GRCC'S CROSS–APPEAL

A. *GRCC's Entitlement to Attorney Fees and Expenses Incurred in Defeating Thayn's Temporary Restraining Order and Motion for Preliminary Injunction*

■ ¶ 38 In 1999, Thayn obtained a temporary restraining order and sought a preliminary injunction to stop construction work on the 40–foot wall built by GRCC across the head of the raceway. After the hearing on Thayn's motion for a preliminary injunction, the trial court found that any injury suffered by Thayn was not irreparable. The trial court found that any damage to Thayn's canal as a result of the 40–foot wall could be assessed and compensated for in money damages. That is, even if GRCC's conduct was wrongful, the appropriate relief was to seek a remedy at law, rather than the equitable remedy of an injunction. The trial court therefore denied the application for a preliminary injunction and dissolved the temporary restraining order. At issue now is whether GRCC can recover reasonable attorney fees and other litigation expenses for fighting the imposition of a preliminary injunction rather than fighting to dissolve the wrongfully-is-

---

will receive his annual payments for joint maintenance of the raceway and diversion works.

**10.** Both parties introduced testimony at trial demonstrating that the raceway has enough capacity to satisfy both Thayn's and GRCC's needs. GRCC's expert witness Jack Barnett testified that he took measurements of the canal and raceway showing 532 cfs in the raceway and 692 cfs in the canal. GRCC also cites evidence of diversions up to 753 cfs. Thayn called David Hansen as his expert. In Hansen's view, there was ade-

quate water in the raceway to meet the 800 cfs needs of both parties, but that there was a restriction in the canal limiting the canal flow that required the canal to be cleaned and its siphon enlarged. To the extent the 1952 Agreement imposes requirements on each party to ensure that they keep their portions of the diversion works in a state of operation that ensures the parties will have satisfactory access to their water, those obligations must be met.

sued temporary restraining order. We find that GRCC can recover its fees and expenses.

¶ 39 The Utah Rules of Civil Procedure allow a wrongfully restrained party to recover attorney fees incurred in connection with a temporary restraining order or injunction. Utah R. Civ. P. 65A(c)(2); *Beard v. Dugdale*, 741 P.2d 968 (Utah Ct.App.1987); *see also McAtee v. Faulkner Land & Livestock*, 113 Idaho 393, 744 P.2d 121 (Ct.App. 1987) (interpreting Idaho R. Civ. P. 65(c), which employs similar language to the Utah rule). Fighting the imposition of a preliminary injunction is a collateral attack on an existing temporary restraining order. *IKON Office Solutions, Inc. v. Crook*, 2000 UT App 217, ¶ 22, 6 P.3d 1143 (Utah Ct.App.2000). Moreover, the temporary restraining order must be dissolved if the trial court refuses to allow the order to be enforced as a preliminary injunction. Utah R. Civ. P. 65A(b)(3). In *Ikon Office Solutions,* the court of appeals held that requiring a party to bring a separate motion to dissolve the temporary restraining order, apart from its defense against a preliminary injunction, would be "duplicative, costly, and probably futile." *Id.* at ¶ 14. Here, when GRCC attacked the preliminary injunction, they were also attacking the temporary restraining order. The language of the trial court's order demonstrates this clearly: "The Temporary Restraining Order is dissolved and the Motion for a Preliminary Injunction is denied." Because GRCC effectively defeated a wrongfully issued restraining order by attacking its enforcement as a preliminary injunction, GRCC is entitled to its attorney fees.

¶ 40 GRCC may also recover other expenses incurred in fighting the preliminary injunction, including expert witness fees. We see no rationale for allowing recovery of attorney fees but denying other litigation expenses. The use of costs and damages in Rule 65A(c) has always been interpreted more broadly than traditional limitations on the term "costs." *See Mountain States Tel.*

& Tel. Co. v. Atkin, Wright, & Miles, Chartered,* 681 P.2d 1258, 1262 (Utah 1984) (allowing recovery of attorney fees in damages under Rule 65A(c) before the amendment of the statute explicitly allowed such recovery); *but see Frampton v. Wilson,* 605 P.2d 771, 774 (Utah 1980) (limiting the definition of the term "costs" to "fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment," excluding expert witness fees). Like attorney fees, these were costs incurred as a direct result of a wrongful enjoinder. We therefore find that Rule 65A(c) is sufficiently broad to include recovery of the litigation expenses sought by GRCC.[11]

¶ 41 Finally, we note that the preliminary injunction was not wrongfully denied. The trial court based its denial partially on Thayn's lack of an underlying claim related to the subject of the preliminary injunction. Thayn argues that he was wrongfully denied a counterclaim that would have given him a basis for this preliminary injunction. However, this does not alter the validity of the denial of the preliminary injunction itself. The trial court primarily based its denial on the fact that any harm Thayn suffered was not irreparable. The lack of an underlying claim was not essential to the denial of the preliminary injunction, and therefore the preliminary injunction was not wrongfully denied.

### B. The Trial Court's Failure to Disgorge Thayn's Profits

¶ 42 GRCC also argues on cross-appeal that the trial court abused its discretion in refusing to disgorge Thayn's profits from the generation of hydroelectric power. Since we have already ruled that Thayn did not breach the 1952 Agreement and 1952 Amendment in diverting water to generate hydroelectric power, there is no legal basis for the disgorgement of Thayn's profits, if any.

---

11. The amount of attorney fees and expenses recovered may not be limited by the bond posted, as Rule 65A(c)(2) expressly mandates: "The amount of security shall not establish or limit the amount of costs, including reasonable attorney fees incurred in connection with the restraining order ... or damages that may be awarded to a party who is found to have been wrongfully restrained or enjoined." Utah R. Civ. P. 65A(c)(2).

## C. Appurtenance of the Radial Gates to the Pumphouse

¶ 43 At trial, GRCC argued that Thayn trespassed on its property when he removed portions of the wing wall, extended the trash racks further onto GRCC property, cut down trees on GRCC property and placed the control mechanisms for the radial sluice gates in the pumphouse. The trial court ruled, inter alia, that Thayn did not trespass on GRCC's property when he placed the control mechanisms for the radial sluice gates in the pumphouse because the radial gates are appurtenant to the pumphouse. GRCC contends that the trial court erred in ruling that the radial sluice gates are appurtenant to the pumphouse.

¶ 44 GRCC bases its appeal on Thayn's inability to prove that the radial sluice gates were a part of the pumphouse prior to 1952, and thus, were not necessarily conveyed to Wilson when he took control of the pumphouse under the 1952 Agreement. Furthermore, GRCC argues that since the radial sluice gates aid in cleaning out the raceway, thus improving the flow of water to the parties, that the radial sluice gates are in fact appurtenant to the raceway, not to the pumphouse.

¶ 45 The trial court did not err in determining that the radial sluice gates are appurtenant to the pumphouse. While the record does not conclusively establish when the sluice gates were introduced into the facilities, it is clear that they have always been under the operation and control of either Thayn or Wilson. Indeed, GRCC acknowledges that Thayn has maintained, repaired and even replaced the radial sluice gates. GRCC has never been in control of the radial gates to conduct sluicing. Moreover, while the sluicing function is necessary for both parties to get their water from the raceway, it must be noted that the sluice gates cannot be operated without the machinery and facilities of the pumphouse, which are indisputably within Thayn's control. Finally, because both parties acknowledge that frequent sluicing has always been necessary to keep the raceway delivering water to both parties, we will not disturb the trial court's ruling that the gates must have been in existence at the time of the parties' agreement in 1952.

## CONCLUSION

¶ 46 We reverse the trial court's entry of summary judgment for GRCC on the breach of contract issue, grant Thayn's motion for summary judgment and lift the trial court's injunction. Thayn is entitled to use his 35 cfs for irrigation water and to use his 600 cfs water right to generate hydroelectric power. Until the State Engineer or the trial court in the general adjudication rules otherwise, GRCC is permitted to take 60 cfs during the irrigation season and 20 cfs during the non-irrigation season, consistent with the State Engineer's proposed determination. The remaining provisions of the 1952 Agreement and Amendment, insofar as they relate to issues of ownership of the diversion facilities and joint maintenance thereof, shall continue to be enforceable by both parties. It should be emphasized that Thayn bears the burden under the 1952 Agreement of paying for his own improvements to the diversion facilities. GRCC has the obligation to keep its canal and diverting works clean and in good operation, but it is under no obligation to subsidize other improvements needed to guarantee Thayn access to the water needed to generate power. Consistent with the Agreement, both parties have an obligation to maintain their own portions of the diverting works so as to permit the other the full use and enjoyment of his facilities.

¶ 47 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Judge NEHRING concur in Chief Justice DURHAM's opinion.

¶ 48 Having recused himself, Justice RUSSON does not participate herein; Third District Judge RONALD E. NEHRING sat.