98 P.3d 1 (2004)
2004 UT 67
In the matter of the GENERAL DETERMINATION OF the RIGHTS TO USE ALL OF the WATER, BOTH SURFACE AND UNDERGROUND, WITHIN the DRAINAGE AREA OF UTAH LAKE AND JORDAN RIVER IN UTAH, SALT LAKE, DAVIS, SUMMIT, WASATCH, SANPETE, AND JUAB COUNTIES in Utah.
Butler, Crockett and Walsh Development Corporation; The Pinecrest Water Company; and LeRoy Meyer, Plaintiffs, Appellants, and Cross-Appellees,
v.
Pinecrest Pipeline Operating Company and Pinecrest Water Users Association, Defendants, Appellees, and Cross-Appellants.
State of Utah, Appellee and Cross-Appellee.
No. 981509.
Supreme Court of Utah.
August 17, 2004.
*3 Brent A. Bohman, Morgan, and John Walsh, Salt Lake City, for plaintiffs.
Jeffrey W. Appel, Jennifer L. Crane, Salt Lake City, for defendants.
Mark L. Shurtleff, Att'y Gen., Norman K. Johnson, L. Ward Wagstaff, Julie I. Valdes, Asst. Att'ys Gen., Salt Lake City, for the State.
PARRISH, Justice:
¶ 1 We review the trial court's adjudication of certain water rights associated with the Emigration Creek Subdivision of the Salt Lake County East Division of the Utah Lake and Jordan River Drainage Area ("Emigration Creek Subdivision"). LeRoy Meyer ("Meyer") appeals a summary judgment in favor of Pinecrest Pipeline Operating Company ("PPOC") as to the ownership of Water User's Claim ("WUC") 57-8492. PPOC cross-appeals the trial court's determination that WUC 57-3442 was not forfeited by Meyer's predecessor in interest. The state engineer appears as appellee and cross-appellee. We affirm the summary judgment in favor of PPOC on the ownership of WUC 57-8492 and also affirm the trial court's rulings regarding the alleged forfeiture of WUC 57-3442.

BACKGROUND
¶ 2 In the 1970s, the state engineer began the process of determining water rights within the Emigration Creek Subdivision, which includes the Pinecrest area. Settlers in the early 1900s had established a community in the Pinecrest area of Emigration Canyon with the construction of cabins, cottages, and the Pinecrest Hotel. The community received spring water through a redwood stave pipeline constructed in 1912.
¶ 3 In subsequent years, additional cabins and cottages were constructed and connected to the redwood stave pipeline. The hotel burned and was torn down in 1951, and thereafter the collective cabin and cottage owners operated and maintained the pipeline exclusively. In the mid-1970s, the owners discussed among themselves the need to construct a new pipeline to replace the dilapidated redwood stave pipeline. A new pipeline identified as "the blue line" was consequently constructed.
*4 ¶ 4 Meyer is a resident of the Pinecrest community. Following completion of the blue line, Meyer sent a letter to other property owners addressing the need to incorporate the informal association of property owners that had been operating and maintaining the pipelines. Prior to that time, the association had held meetings, but the name of the association varied according to who kept the minutes. In June 1982, the property owners incorporated under the name Pinecrest Pipeline Operating Company, commonly referred to as PPOC.
¶ 5 When the state engineer assessed the rights of the water users in the Emigration Creek Subdivision and published his proposed determination, a dispute erupted over the ownership of the pipeline system, the existence and ownership of property easements for the system, and ownership of the underlying water rights. The interested parties initiated litigation in the trial court. The overall adjudication was bifurcated into two proceedings. The first proceeding resolved issues related to the pipeline system and property easements. The second proceeding, which involved ownership of the water rights, is the subject of this appeal. The result of the first proceeding also was appealed to this court. Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating Co. (In re General Determination of Rights to Use All Water), 909 P.2d 225 (Utah 1995). Additional background on the parties and the development of the Pinecrest area community is found in that opinion. Id. at 227-30.

I. WUC 57-8492
¶ 6 Because the dispute regarding ownership of WUC 57-8492 was decided on summary judgment, we recite and view the relevant facts in the light most favorable to Meyer, who was the nonmoving party below. Norman v. Arnold, 2002 UT 81, ¶ 2, 57 P.3d 997.
¶ 7 Meyer became part of the Pinecrest area community in approximately 1970 when he purchased property and a cabin near the site of the former hotel. Meyer obtained water for his property by hooking into the redwood stave pipeline and thereafter joined the association of property owners operating and maintaining the water system. From time to time, Meyer performed work on the pipeline for which the other property owners reimbursed him.
¶ 8 In 1979, Meyer began negotiating to purchase the property on which the old hotel had once stood. In connection therewith, Meyer met an official from the state engineer's office who was assessing water rights in the area. Meyer spoke with the official about the pipeline system and the water being used by the homes connected to the line. The official suggested that Meyer fill out a water user's claim form for the water, and Meyer did so. On the form, in the space designated for the name of the claimant, Meyer identified "Pinecrest Water Users Association c/o LeRoy Meyer (Treasurer)." In the space designated for the claimant's signature, Meyer signed his name. The completed form for WUC 57-8492 noted the water usage of twenty-seven families and listed a priority date of 1908.
¶ 9 When the state engineer published the proposed determination of water rights in the Emigration Creek Subdivision, WUC 57-8492 was omitted. The recently incorporated PPOC filed an objection to the proposed determination based on the omission, claiming a right to the water as successor in interest to the Pinecrest Water Users Association. In response, the state engineer admitted that WUC 57-8492 "was inadvertently omitted from the proposed determination" and recommended that the water rights identified in WUC 57-8492 go to PPOC. Meyer accepted service of the proposed determination and filed no objection thereto.
¶ 10 In the trial court, Meyer maintained that he filed WUC 57-8492 on his own behalf, rather than on behalf of the association of property owners operating and maintaining the water system. He therefore argued that the associated water rights belong to him personally. PPOC opposed Meyer's personal claim to the water rights and ultimately prevailed on this issue through summary judgment.

II. WUC 57-3442
¶ 11 In the trial court, PPOC and Butler, Crockett and Walsh Development Company *5 ("BCWDC") litigated the validity of WUC 57-3442. BCWDC thereafter transferred its interests in WUC 57-3442 to Meyer, who represents those interests on appeal.
¶ 12 BCWDC acquired WUC 57-3442 in connection with the purchase of real property in 1981. WUC 57-3442 entitles its owner to 21.61 acre-feet of water per annum. Soon after obtaining WUC 57-3442, BCWDC filed a change application with the state engineer to alter the nature of the approved use from domestic to irrigation. As part of the approval process for the change application, an official from the state engineer's office conducted a field examination of BCWDC's property in October 1981 and again in February 1982. The official confirmed the property's acreage and the existence of water diversion works for irrigation. His report noted that the purpose of the irrigation was to water ten thousand blue spruce trees. The state engineer approved the change application, establishing BCWDC's right to use 21.61 acre-feet of water to irrigate 7.21 acres of land.
¶ 13 When the state engineer's proposed determination of water rights recognized BCWDC as the owner of WUC 57-3442, PPOC objected. PPOC argued that BCWDC had forfeited the water right, either totally or partially, by failing to beneficially use the water for a continuous five-year period. Specifically, PPOC alleged the water was not beneficially used from April 1982 to April 1990.
¶ 14 The parties litigated the forfeiture dispute in the trial court, where BCWDC presented evidence that the water had been used to cultivate trees for a tree farm and that the water was otherwise put to beneficial use irrigating indigenous vegetation on the property. John Walsh ("Walsh"), a principal of BCWDC, testified that he purchased and planted blue spruce seeds in scattered groupings throughout the property. According to Walsh, he planted tree seeds in 1981, 1982, and 1987. Although no blue spruce trees grew, Walsh testified he could have mistakenly planted seeds for white fir or douglas fir trees, which were found on the property. In addition, Walsh testified that he aesthetically enhanced the property through the cultivation of wildflowers indigenous to the area and that he actively irrigated the land throughout the alleged forfeiture period using various new diversion points, causing the natural plants to proliferate and enabling him to harvest and gift trees and berries to friends and family.
¶ 15 In contrast, PPOC presented evidence that Walsh's tree farm failed and that the water was put to only limited, non-beneficial use during the alleged forfeiture period. Specifically, PPOC argued that the methods Walsh employed would have failed to yield conifer trees, that no clear system of irrigation ditches was maintained, and that Walsh's watering of the natural vegetation on the property did not constitute beneficial use. PPOC offered expert testimony that a mature tree farm would consume a maximum of 3.3 acre-feet of water per annum, and argued that the water right should therefore be reduced and limited to that amount.
¶ 16 The trial judge inspected BCWDC's property in 1996 at the conclusion of trial. Ultimately, the court ruled in favor of BCWDC, finding that PPOC had not met its burden of proving total or partial forfeiture by clear and convincing evidence. The court further found that although the tree farm was unsuccessful, BCWDC had beneficially used the water. The court found additional support for its ruling in the fact that the state engineer's proposed determination awarded WUC 57-3442 to BCWDC.
¶ 17 On appeal, PPOC contends the trial court erred in not finding a total or partial forfeiture of WUC 57-3442. In connection therewith, PPOC asserts the trial court erred in giving weight to the state engineer's proposed determination and in concluding that Walsh's use of the water constituted beneficial use.

ANALYSIS
¶ 18 We begin by addressing Meyer's appeal concerning ownership of WUC 57-8492. We then address PPOC's cross-appeal concerning the alleged forfeiture of WUC 57-3442.

*6 I. OWNERSHIP OF WUC 57-8492
¶ 19 "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Norman v. Arnold, 2002 UT 81, ¶ 15, 57 P.3d 997; Utah R. Civ. P. 56(c). "We give a trial court's decision to grant summary judgment no deference and review it for correctness." Norman, 2002 UT 81 at ¶ 15, 57 P.3d 997. "We view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Id. at ¶ 2.
¶ 20 Meyer's claim of ownership rests on his assertion that he filed WUC 57-8492 for his own benefit and not for the collective benefit of the property owners who operated and maintained the water pipeline system. According to Meyer, the entity he listed as claimant on the WUC form  Pinecrest Water Users Association  was a personal d/b/a of his and not, as PPOC contends, one of the many names the association used prior to its incorporation. Meyer further claims he filed the WUC without the knowledge or direction of the association of property owners and with the sole intention of reserving the WUC rights for himself. In support of its motion for partial summary judgment, PPOC submitted documents in which the association of property owners, before incorporating, referred to itself as the Pinecrest Water Users Association.
¶ 21 Meyer asserts that the question of whether he filed the WUC for himself or for the association created a genuine issue of material fact that should have precluded summary judgment. We disagree and hold that the trial court's summary dismissal of Meyer's claim to WUC 57-8492 was correct for the following three reasons.
¶ 22 First, Meyer failed to object to the state engineer's proposed determination of water rights. Section 73-4-11 of the Utah Code provides as follows:
After full consideration of the statements of claims ... the state engineer shall formulate a report and a proposed determination of all rights to the use of the water ..., and a copy of the same shall be mailed by regular mail to each claimant with notice that any claimant dissatisfied therewith may within ninety days of such mailing file with the clerk of the district court a written objection thereto....
Utah Code Ann. § 73-4-11 (2001). A claimant who fails to file a timely objection to the proposed determination demonstrates acquiescence to the state engineer's delineation of water rights. See United States Fuel Co. v. Huntington-Cleveland Irrigation Co., 2003 UT 49, ¶¶ 19-20, 79 P.3d 945; In re San Rafael River Drainage Area, 844 P.2d 287, 289-91 (Utah 1992). We stated in United States Fuel Co. that "[t]he fate of a water right claimant who fails to object to a proposed award [is] similar to that of a defaulting party in a lawsuit. `If the claimant makes no objection, he, by his silence, ... confesses the statements contained in the engineer's proposed determination of his water rights.'" 2003 UT 49 at ¶ 19, 79 P.3d 945 (quoting Eden Irrigation Co. v. Dist. Ct., 61 Utah 103, 211 P. 957, 960 (1922)).
¶ 23 Meyer signed a receipt and waiver of service of the state engineer's proposed determination in March 1984. He filed no objection to the proposed determination under his own name or under the name of Pinecrest Water Users Association, his claimed d/b/a. Meyer's failure to file an objection within the statutory period prevents him from now contesting the disposition of WUC 57-8492.
¶ 24 Second, the doctrines of appropriation and beneficial use do not support Meyer's claim that he is individually entitled to WUC 57-8492. A water user's appropriations are limited to the amount the user puts to beneficial use. Green River Canal Co. v. Thayn, 2003 UT 50, ¶ 34, 84 P.3d 1134. Beneficial use is "the basis, the measure and the limit of all rights to the use of water in this state." Utah Code Ann. § 73-1-3 (2003). "`No one can acquire the right to use more water than is necessary, with reasonable efficiency, to satisfy his beneficial requirements.'" Green River Canal Co., 2003 UT 50 at ¶ 34, 84 P.3d 1134 (quoting McNaughton v. Eaton, 121 Utah 394, 242 P.2d 570, 572 (1952)).
¶ 25 Meyer's claim of personal ownership based on the historical water usage of multiple *7 families runs afoul of these principles. Meyer submitted an affidavit explaining that he filed WUC 57-8492 in order to claim rights to the amount of water being used by twenty-seven homes attached to the water pipeline system. The claim form likewise notes the domestic water usage of twenty-seven homes. If, as Meyer asserts, the claim form was filed solely for his own benefit and not for the benefit of the association of property owners, then Meyer's argument must fail because a single water user cannot claim more water than he can beneficially use, nor can he claim for himself water beneficially used by others.
¶ 26 Third, we agree with the trial court that the facts surrounding the filing of WUC 57-8492, even when viewed in the light most favorable to Meyer, leave no genuine dispute as to the identity of the claimant. Meyer designated the "Pinecrest Water Users Association c/o LeRoy Meyer (Treasurer)" as the claimant for the water right. Although Meyer asserts that Pinecrest Water Users Association was his personal d/b/a (of which he served as treasurer and all other officers), he did not register that name as a d/b/a before or after filing the water user's claim. When the state engineer sent a letter to Meyer recognizing the filing for "the Pinecrest Water Users," Meyer did not object or ever seek to clarify that the claimant was Meyer individually. PPOC, on the other hand, relied on records of business dealings in which the association of property owners explicitly refers to itself as the Pinecrest Water Users Association. On one document, Meyer and others affixed their signatures as members of the board of directors of the Pinecrest Water Users Association, an action patently inconsistent with Meyer's alleged ownership of Pinecrest Water Users Association as his personal d/b/a.
¶ 27 In addition, the priority date Meyer listed on the claim form is 1908, even though Meyer did not move to the Pinecrest area until approximately 1970. Meyer asserts that he selected that date because he eventually purchased the old hotel property and was entitled to stand in the shoes of the hotel's former owner. This position is untenable because the hotel burned down in 1951 and any water rights associated therewith would necessarily have been long abandoned by 1979 when Meyer filled out the form. See Utah Code Ann. § 73-1-4 (2000). Even if Meyer could claim water rights as a successor in interest to the original owner of the hotel property, he would still be limited to water that had been beneficially used on that property. He could not have claimed water beneficially used by other property owners, as discussed above.
¶ 28 In short, even when viewed in the light most favorable to Meyer, the evidence is insufficient to establish Meyer's claim that he filed WUC 57-8492 for his own benefit rather than for the benefit of the association. Meyer's testimony that he harbored an undisclosed intent to retain all of the water rights for himself is insufficient to establish a genuine issue of material fact precluding summary judgment. In addition, as a matter of law, Meyer was incapable of claiming WUC 57-8492 given his failure to object to the state engineer's proposed determination and his inability to obtain for himself water beneficially used by others.
¶ 29 Meyer raises additional arguments in his quest to overturn the trial court's ruling, none of which we find persuasive. Meyer argues that the trial court improperly relied on legal and factual findings made in the related proceeding, which resolved disputes regarding ownership of the physical water pipeline system, attendant property easements, and various d/b/a designations, including ownership of the d/b/a Pinecrest Water Users Association.[1] Meyer asserts that the trial court's reliance on these findings violated his rights under the due process clauses of the federal and state constitutions, as well as the open courts clause of the state constitution. We need not address this argument because we do not rely on the factual findings in the related proceeding in affirming the summary judgment.
¶ 30 Meyer also argues that PPOC's claim to WUC 57-8492 is defective *8 and that he should therefore be awarded the water rights associated therewith. We disagree inasmuch as any weakness in PPOC's claim to the water does not translate into a cognizable basis for Meyer's claim. Although this litigation arises in the context of a general adjudication and not an action to quiet title, the following principle is nevertheless applicable:
An action to quiet title to water rights is in the nature of an action to quiet title to real estate. To succeed in an action to quiet title to real estate, a plaintiff must prevail on the strength of his own claim to title and not on the weakness of a defendant's title or even its total lack of title. Likewise, in an action to quiet title to water rights, a plaintiff must succeed on the strength of his own title, not on the weakness of defendant's.
Church v. Meadow Springs Ranch Corp., 659 P.2d 1045, 1048-49 (Utah 1983) (citations omitted); see also Salt Lake City v. Silver Fork Pipeline Corp., 2000 UT 3, ¶ 20, 5 P.3d 1206; Colman v. Butkovich, 538 P.2d 188, 189 (Utah 1975). Because Meyer failed to establish a legitimate claim to WUC 57-8492, allegations regarding defects in PPOC's claim are of no consequence. Accordingly, we affirm the trial court's grant of summary judgment awarding WUC 57-8492 to PPOC.

II. FORFEITURE OF WUC 57-3442
¶ 31 We now turn to the cross-appeal. As outlined above, PPOC claimed that BCWDC had forfeited the water rights covered by WUC 57-3442. PPOC based its claim on section 73-1-4 of the Utah Code, which provides:
When an appropriator or his successor in interest abandons or ceases to use water for a period of five years, the right ceases, unless, before the expiration of the five-year period, the appropriator or his successor in interest files a verified application for an extension of time with the state engineer.
Utah Code Ann. § 73-1-4(1)(a) (1998).[2] We read this statute in conjunction with section 73-1-3, which provides that "[b]eneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." Id. § 73-1-3. Forfeiture thus occurs when an appropriator has ceased to use water, or has ceased to use water in a beneficial manner, for a continuous five-year period.
¶ 32 At trial, PPOC argued that BCWDC engaged in only limited, non-beneficial use of its water between April 1982 and April 1990, thereby resulting in a forfeiture of all or part of the water rights. The trial court disagreed, ruling in BCWDC's favor. On appeal, PPOC presents three main arguments. First, PPOC asserts that the trial court clearly erred in finding that BCWDC actively used the water for irrigation during the alleged forfeiture period. Second, PPOC asserts that the trial court erred in giving weight to the state engineer's proposed determination, which identified BCWDC as the owner of WUC 57-3442. Finally, PPOC asserts that the trial court erred in determining that BCWDC beneficially used the water. We address each argument in turn.

A. Factual Findings Regarding BCWDC's Water Use
¶ 33 PPOC's first argument necessitates a review of the trial court's factual findings. Water forfeiture rulings generally depend heavily on questions of fact (e.g., whether and how much water was diverted and when, where, and to what end the diverted water was used). We will reverse the trial court's findings of fact only if they are clearly erroneous. Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Factual findings are clearly erroneous if they are "not adequately supported by the record, resolving all disputes in the evidence in a light most favorable to the trial court's determination." State v. Pena, 869 P.2d 932, 935-36 (Utah 1994). In addition, because the trial judge actually visited BCWDC's property to put the evidence in perspective, we are particularly reticent to *9 second-guess his factual findings. See In re Escalante Valley Drainage Area, 11 Utah 2d 77, 355 P.2d 64, 66 (1960).
¶ 34 PPOC disputes the trial court's factual finding that BCWDC actively used its water for irrigation throughout the forfeiture period, arguing that "[i]n this case the evidence shows that BCWDC, having failed in its efforts to grow trees, simply let the water run over the ground." At trial, PPOC offered evidence that BCWDC failed in creating and maintaining an active system of diversions and ditches for irrigation. Two individuals who resided in the Pinecrest area during the alleged forfeiture period testified that they did not see diversion works suitable for irrigation on the property. One of the residents testified that he saw a small hand-dug ditch that meandered around the property, but that the ditch contained no water. PPOC's expert witnesses, who examined the property in 1989, likewise testified that they saw no maintained system of irrigation, although one expert testified that he observed randomly placed hand-dug ditches in a state of disrepair.
¶ 35 In contrast, Walsh testified that he managed multiple diversion points and check dams, directing water through a planned system of ditches. He also testified that he planted and transplanted vegetation along the irrigated areas, and otherwise did not fail to use the water for any five-year continuous period. A witness who visited the property in 1996 testified that she saw places of irrigation and ditches around which the plants were more "lush." In addition, the official from the office of the state engineer who inspected the property in 1982 testified that he saw established diversion works on the property at that time.
¶ 36 After considering all evidence, the trial judge ruled in favor of BCWDC, finding that "the evidence shows that BCWDC has used the water during the time period in question." While the trial judge found that the tree farm was not ultimately successful, he concluded that, through Walsh's irrigation efforts, the water at issue satisfied aesthetic desires, encouraged indigenous plants to proliferate, reduced fire hazard, and created property line buffers.
¶ 37 In prosecuting its forfeiture claim, PPOC accepted the burden of producing clear and convincing evidence of forfeiture.[3] With this burden in mind, we find that the trial court's factual findings are adequately supported by the record. Our review does not lead us to a "definite and firm conviction that a mistake has been made." Sweeney Land Co. v. Kimball, 786 P.2d 760, 761 (Utah 1990) ("`[W]e do not set aside the trial court's factual findings unless they are against the clear weight of the evidence or we otherwise reach a definite and firm conviction that a mistake has been made.'" (quoting W. Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co., 744 P.2d 1376, 1377 (Utah 1987))). We therefore uphold the trial court's finding that BCWDC actively used the water with no intervening five-year period of non-use.

B. Weight of Proposed Determination
¶ 38 We next address PPOC's contention that the trial court accorded undue deference to the state engineer's proposed determination regarding WUC 57-3442. The appropriate deference to be accorded to the state engineer's determination is a question of law that we review for correctness. Wilson Supply Inc. v. Fradan Mfg. Corp., 2002 UT 94, ¶ 11, 54 P.3d 1177 ("Generally, we review a trial court's legal conclusions for correctness, according the trial court no particular deference." (citation omitted)).
¶ 39 The trial court gave "great weight" to the state engineer's determination, which supported BCWDC's claim to WUC 57-3442. PPOC argues that the trial court did so improperly, thereby abdicating its role as sole arbiter of law and fact. While PPOC *10 acknowledges that determinations of the state engineer are generally entitled to at least some weight, it reasons that the claims and circumstances presented by this particular case render the state engineer's determination irrelevant. The state engineer agrees that the proposed determination was not relevant to the allegations of forfeiture in this case.
¶ 40 We have previously explained the singular role played by the state engineer in the process of water rights adjudication. See, e.g., Green River Canal Co. v. Thayn, 2003 UT 50, ¶¶ 28-30, 84 P.3d 1134; United States Fuel Co. v. Huntington-Cleveland Irrigation Co., 2003 UT 49, ¶ 14, 79 P.3d 945; In re San Rafael River Drainage Area, 844 P.2d 287, 289-90 (Utah 1992); In re Escalante Valley Drainage Area, 11 Utah 2d 77, 355 P.2d 64, 65 (1960). The state engineer "is an executive, not a judicial officer," and "does not have authority to adjudicate the rights of water users." Green River Canal Co., 2003 UT 50 at ¶ 30, 84 P.3d 1134 (citations omitted). Accordingly, courts are not obligated to defer to the state engineer's proposed determinations.[4]United States Fuel Co., 2003 UT 49 at ¶ 14, 79 P.3d 945 ("While courts may consider the state engineer's determination persuasive in determining parties' respective rights, they are under no obligation to defer to his or her findings."). At the same time, however, we have recognized that the state engineer "has `special training in the operation and control of natural streams and irrigation and other artificial use and control of water and water rights' and that `he is especially qualified to understand the facts involved in these problems.'" Green River Canal Co., 2003 UT 50 at ¶ 31, 84 P.3d 1134 (quoting E. Bench Irrigation Co. v. State, 5 Utah 2d 235, 300 P.2d 603, 606 (1956)); see also In re Escalante, 355 P.2d at 65 ("[The state] engineer's determination is not an arbitrary thing but is based upon many things, including an extensive survey of the area and its water systems and ditches.").
¶ 41 The proposed determination in this case recommended that WUC 57-3442 be awarded to BCWDC. The proposed determination, published in 1983, was based on field inspections of BCWDC's property conducted in October 1981 and February 1982. However, PPOC's forfeiture claim was based on the period of April 1982 to April 1990. Given that the dates of alleged forfeiture extend far beyond the dates of the state engineer's field inspections, we agree with PPOC that the state engineer's recommendation could have only limited bearing on the forfeiture determination in this case. Nevertheless, we do not find that the trial court's consideration of the proposed determination necessitates reversal of the trial court's ruling because the trial court independently assessed the evidence offered by the parties and was unable to find, "based upon the evidence offered, that BCWDC[ ] forfeited its water right under WUC 57-3442, based upon non-use." The trial court, in making its own factual findings, stated that "the evidence shows that BCWDC has used the water during the time period in question." This finding did not rely on the state engineer's proposed determination and was itself sufficient to deny PPOC's claim.

C. Beneficial Use
¶ 42 We now turn to PPOC's argument that the trial court erred in finding that BCWDC's irrigation efforts constituted beneficial use. PPOC argues that BCWDC failed to put the water at issue to beneficial use, with the exception of the water used to irrigate the tree farm. Because the trial court found that Walsh's attempts at cultivating a tree farm were not ultimately successful, PPOC argues that BCWDC entirely forfeited its rights to the water at issue. Alternatively, PPOC would have this court recognize a partial forfeiture of all water beyond the *11 amount needed to support a hypothetical mature tree farm.

1. Standard of Review
¶ 43 The question of whether Walsh put the water to beneficial use is a mixed question of fact and law. "A mixed question involves `the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law.'" Jensen v. IHC Hosps., Inc., 2003 UT 51, ¶ 57 n. 11, 82 P.3d 1076 (quoting State v. Hansen, 2002 UT 125, ¶ 26 n. 3, 63 P.3d 650) (further citation omitted). If a case involves a mixed question of fact and law, we afford some measure of discretion to the trial court's application of law to a given fact situation. State v. Pena, 869 P.2d 932, 937-38 (Utah 1994); see also Jeffs v. Stubbs, 970 P.2d 1234, 1244 (Utah 1998). "The measure of discretion afforded varies, however, according to the issue being reviewed." Hansen, 2002 UT 125 at ¶ 26, 63 P.3d 650 (citing Pena, 869 P.2d at 937-38).
¶ 44 "[W]e decide how much discretion to give a trial court in applying the law in a particular area by considering a number of factors pertinent to the relative expertise of appellate and trial courts in addressing those issues." Jeffs, 970 P.2d at 1244 (citing Pena, 869 P.2d at 938-39). In Pena, we identified three factors to be considered when determining the appropriate deference to accord mixed questions of law and fact. These considerations are (1) whether "the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out"; (2) whether "the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative"; and (3) whether "the trial judge has observed `facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." Pena, 869 P.2d at 938-39; see also Jeffs, 970 P.2d at 1244; Carrier v. Pro-Tech Restoration, 944 P.2d 346, 351 (Utah 1997). We also consider whether there are countervailing policy reasons for not granting broad discretion, such as the interest in creating "standard uniformity among trial courts addressing the question." Jeffs, 970 P.2d at 1244; see also Pena, 869 P.2d at 939 (discussing interest in having uniform legal rules regarding consent to police searches "given the substantial Fourth Amendment interests lost as a result of such consents").
¶ 45 We begin with the first Pena consideration, which requires us to evaluate the complexity and variety of possible factual issues. In this regard, we note that beneficial use determinations rely heavily on the facts and circumstances of each case, with the underlying facts varying significantly in each dispute. This variety of factual scenarios supports a broad, rather than narrow, grant of discretion to the finder of fact. See Dep't of Human Servs. ex rel. Parker v. Irizarry, 945 P.2d 676, 678 (Utah 1997) ("The variety of fact-intensive circumstances involved [in equitable estoppel cases] weighs heavily against lightly substituting our judgment for that of the trial court. Therefore, we properly grant the trial court's decision a fair degree of deference when we review the mixed question of whether the requirements of the law of estoppel have been satisfied in any given factual situation."); Kohler v. Martin, 916 P.2d 910, 912 (Utah Ct.App.1996) ("When the decisions are more fact-dependent, or when the credibility of the witnesses has a strong bearing on the decision, broader discretion is generally granted to the trial court.").
¶ 46 In addition, we note that the concept of beneficial use is not static. Rather, it is susceptible to change over time in response to changes in science and values associated with water use. Janet C. Neuman, Beneficial Use, Waste, and Forfeiture: The Inefficient Search for Efficiency in Western Water Use, 28 Envtl. L. 919, 942 (1998) ("`What is a beneficial use, of course, depends upon the facts and circumstances of each case. What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time *12 may, because of changed conditions, become a waste of water at a later time.'" (quoting Imperial Irrigation Dist. v. State Water Res. Control Bd., 225 Cal.App.3d 548, 570, 275 Cal.Rptr. 250 (1990) (further citation omitted))); id. at 946 ("Beneficial use is a somewhat flexible concept, changing over time to accommodate developments in thinking about water use, such as changes in science and values."). Accordingly, beneficial use "must remain a flexible and workable doctrine." Jeffs, 970 P.2d at 1245 (applying the Pena considerations to unjust enrichment rulings and granting trial courts broad discretion).
¶ 47 The second Pena consideration requires us to evaluate the relative novelty of the applicable legal principle. In examining this consideration, we note that the doctrine of beneficial use has roots dating back to the turn of the last century. See Neuman, 28 Envtl. L. at 920-21. However, our cases and statutes addressing beneficial use have generally used the term without defining it and have failed to identify any standard factors to be considered in evaluating whether a particular use is beneficial. Stated in terms of the Pena metaphor, trial judges in this state confront a pasture that has yet to be narrowly fenced in individual determinations of beneficial use. See Pena, 869 P.2d at 937-38 (analogizing the extent of a trial judge's discretion to a pasture that diminishes in size as it is "fenced" by existing laws and clarifications by appellate courts). Consequently, this consideration also supports a relatively broad grant of discretion to the trial court. See Carrier, 944 P.2d at 352 (granting limited discretion to a trial court's rule 47(c) decisions because, in part, this court had already "fenced off many scenarios that might arise in such cases," and few possible scenarios remained).
¶ 48 The third Pena consideration emphasizes the special ability of trial courts to weigh contradictory evidence from witnesses, assess credibility and demeanor, and make factual findings. 869 P.2d at 939; Jeffs, 970 P.2d at 1245. As previously mentioned, beneficial use determinations are generally dependent on the trial court's findings of fact. The same is true in the case now before us, and this consideration thus weighs in favor of our granting broad discretion to the trial judge in determining whether BCWDC put its water to beneficial use.
¶ 49 While the first three Pena considerations suggest that the trial court's determination of beneficial use is entitled to broad discretion, we must also consider whether any countervailing policy reason dictates a contrary result. Such a policy reason exists in this case. We have repeatedly recognized the importance of insuring that the waters of our state are put to beneficial use. See, e.g., Eskelsen v. Town of Perry, 819 P.2d 770, 775-76 (Utah 1991) ("[T]he state is ... vitally interested in seeing that none of the waters are allowed to run to waste or go without being applied to a beneficial use for any great number of years." (quotation and citation omitted)); Wayman v. Murray City Corp., 23 Utah 2d 97, 458 P.2d 861, 863 (1969) ("Because of the vital importance of water in this arid region both our statutory and decisional law have been fashioned in recognition of the desirability and of the necessity of insuring the highest possible development and of the most continuous beneficial use of all available water with as little waste as possible.").
¶ 50 In view of the importance of beneficial use determinations in this state, we hold that the discretion afforded to the trial court should be somewhat narrowed. In Pena, we described a "spectrum of discretion ... running from `de novo' on the one hand to `broad discretion' on the other." 869 P.2d at 937. In beneficial use determinations, the appropriate degree of deference to the trial court falls somewhere in between the two ends of the spectrum. Accordingly, in reviewing the trial court's ruling on beneficial use, we will afford the trial court significant, though not broad, discretion.

2. Irrigation of Natural Vegetation as Beneficial Use
¶ 51 Having determined the applicable standard of review, we now address PPOC's claim that BCWDC's irrigation efforts did not qualify as beneficial use. Our legislature has declared that beneficial use "shall be the basis, the measure and the limit of all rights to the use of water in this state." *13 Utah Code Ann. § 73-1-3 (1998); see also id. § 73-3-1 (stating that appropriation must be "for some useful and beneficial purpose"). Accordingly, "[a]n appropriative water right depends on beneficial use for its continued validity." Eskelsen, 819 P.2d at 775. Beneficial use is more than use alone; thus, a finding of beneficial use requires more than a mere diversion of water. Richfield Cottonwood Irrigation Co. v. Richfield, 84 Utah 107, 34 P.2d 945, 949 (1934) ("The mere fact that the city of Richfield has for many years diverted water from Cottonwood creek does not give it the right to the use of such water nor establish a right thereto. It must be made to appear that the water diverted has been put to a beneficial use."); see also Santa Fe Trail Ranches Prop. Owners Assoc. v. Simpson, 990 P.2d 46, 54 (Colo.1999) ("Diversion of water by itself cannot ripen into a water right if the water is not used beneficially."). Similarly, a diversion of water merely to serve purposes of speculation or monopoly will not constitute beneficial use. See Utah Code Ann. § 73-3-8 (1998).
¶ 52 "As developed in the courts, beneficial use has two different components: the type of use and the amount of use." Neuman, 28 Envtl. L. at 926. PPOC's forfeiture claim turns on the first of these components, namely, whether Walsh's irrigation of natural vegetation was the type of use that could be considered beneficial.
¶ 53 At trial, Walsh testified that his irrigation of BCWDC's property allowed him to successfully cultivate various plants of a type indigenous to the area, including plants he purchased at a nursery and relocated to the property. Walsh further testified that he was able to harvest berries and also trees to gift to friends and family, and that the enhanced foliage provided feed and cover for animal life in the area. The trial court found that Walsh's irrigation produced the benefits of, "among other uses," "satisfy[ing] aesthetic desires," "reduc[ing] the fire hazard," and "creat[ing] property line buffers." The trial court then ruled that the use of water to these ends, "under the circumstances of this case[,] does constitute a beneficial use." The trial court did not cite, nor did BCWDC provide, any case law recognizing the use of water to these ends as beneficial.[5] Instead, the trial court relied on the notion that beneficial use as a concept has evolved beyond the traditional requirement that a use result in economic benefit, stating, "The early cases holding that a beneficial use meant an agricultural crop, or use in a heavy industrial setting, did not necessarily exclude uses that might be recognized today as a beneficial use, such as enhancing or maintaining indigenous foliage and vegetation."
¶ 54 Whether Walsh put the water to a beneficial type of use is a close question. We are particularly skeptical of ends that appear to be merely incidental to water use and that are declared as beneficial only in hindsight. However, because the trial court is entitled to significant discretion in applying principles of beneficial use, we affirm the trial court's finding that the water available under WUC 57-3442 was put to beneficial use during the alleged forfeiture period and its corollary holding that PPOC failed to establish its forfeiture claim. We caution, however, that our holding should not be interpreted to imply that irrigation of natural vegetation generally constitutes beneficial use. Such an interpretation would not only be inaccurate, it would expand the concept of beneficial use beyond any meaningful application in future disputes.
¶ 55 While watering indigenous vegetation generally is not a beneficial use and may, in fact, be wasteful, a determination of beneficial use relies on the individual facts and circumstances of a given situation. In cases such as this, consideration of the ends to which the irrigation has been applied is particularly *14 relevant. For example, it is conceivable that one water user would irrigate natural vegetation for purposes of land reclamation or cultivation of vegetation for grazing,[6] while another might inattentively run water through fallow fields merely as a subterfuge to maintain a water right or to hoard water for speculation. While the former situation could conceivably constitute beneficial use, the latter could not.

3. Partial Forfeiture
¶ 56 As an alternative to total forfeiture, PPOC alleged partial forfeiture of BCWDC's water rights. While PPOC provided no evidence that BCWDC failed to irrigate any specific amount of acreage or that BCWDC failed to divert any specific portion of the water to which it was entitled, PPOC offered considerable evidence as to the amounts of water consumed by specific types of trees. PPOC's experts testified that a full farm of blue spruce trees, such as Walsh had intended to cultivate, could consume only 3.3 acre-feet of water per year. PPOC then argued that BCWDC's water rights should be restricted to that amount inasmuch as any additional water could not have been put to beneficial use. Because we have affirmed the trial court's finding that BCWDC put its water to a beneficial type of use outside of any efforts to cultivate a tree farm, we need not address this argument.[7]
¶ 57 PPOC also seeks partial forfeiture on the basis that BCWDC used more water than was reasonably needed to irrigate the natural vegetation on the property. PPOC did not, however, support this argument by presenting specific evidence as to what portion of the water would be sufficient to irrigate the vegetation, nor did PPOC offer authority for the diminution of water rights based on the specific types of plants a water user has cultivated.[8] PPOC's testimony at trial regarding the measure of water needed to irrigate the vegetation indicated only that it would likely be some small amount. In the face of this lack of evidence as to the portion of the water necessary to irrigate the natural vegetation, the trial court properly rejected PPOC's partial forfeiture claim.

CONCLUSION
¶ 58 We uphold the trial court's summary judgment regarding ownership of WUC 57-8492. Because he failed to file a timely objection to the proposed determination of the state engineer, Meyer cannot contest it now. Moreover, as an individual water user, Meyer cannot claim for himself water beneficially used by others, nor can he claim more water than he can put to beneficial use.
¶ 59 We also affirm the trial court's ruling that BCWDC did not forfeit its water rights under WUC 57-3442. Beneficial use is a mixed question of law and fact, and we afford significant discretion to the trial court in reviewing a ruling on beneficial use. In this case, we find sufficient evidence to support the trial court's ruling that PPOC failed to establish forfeiture of the water for a continuous five-year period.
¶ 60 Justice DURRANT, Judge GREENWOOD, and Judge ALLPHIN concur in Justice PARRISH's opinion.
ORME, Court of Appeals Judge, concurring:
¶ 61 I concur in the court's opinion. My limited purpose in writing separately is to *15 emphasize that the principle of beneficial use is flexible and evolving. I see no real hindrance to concluding that the use of water to irrigate natural vegetation can constitute, under appropriate circumstances, a beneficial use. In an area like Emigration Canyon, changing landscaping preferences may well favor preservation and enhancement of natural vegetation over the more traditional practice of uprooting natural vegetation and replacing it with sod, rose bushes, and fruit trees. Our notion of beneficial use should not be so rigid as to favor one landscaping preference over another. Thus, I do not look askance at the idea that natural vegetation can be productively watered and that doing so may well qualify as a beneficial use.
¶ 62 While at first blush it may seem otherwise, irrigating "natural" vegetation at water levels beyond what nature would itself provide is not a contradiction in terms. In our arid climate, especially during periods of drought, leaving natural vegetation alone  letting nature run its course  may well leave vegetation that is stunted and dry, resulting in a veritable tinderbox that is far from desirable in areas of human habitation. In contrast, watering such vegetation may permit it to grow and thrive, which may thus be beneficial in a utilitarian as well as a purely aesthetic sense. I gather that a more natural approach to landscaping, if done correctly, also results in reduced water consumption compared to the water required to sustain more traditional residential landscaping, thus paying broader societal dividends of conservation. It is not really much of a stretch at all to view such a use of water as constituting a valid beneficial use.
¶ 63 Having disqualified themselves, Chief Justice DURHAM, Associate Chief Justice WILKINS, and Justice NEHRING do not participate herein; Court of Appeals Judges PAMELA T. GREENWOOD and GREGORY K. ORME, and District Judge MICHAEL G. ALLPHIN sat.
NOTES
[1] In the related proceeding, the trial court determined that the d/b/a Pinecrest Water Users Association properly belonged to the shareholders of PPOC.
[2] Subsequent to the initiation of this action, this statute was revised. See Utah Code Ann. § 73-1-4 (1998 & Supp.2003). In this opinion, we quote the statute as it appeared prior to revision.
[3] While past forfeiture cases in the arena of water rights have not addressed a forfeiture claimant's evidentiary burden, neither party in this case has challenged the trial court's ruling that PPOC was required to prove forfeiture by clear and convincing evidence. Because the issue was neither preserved nor briefed in this case, we apply the standard used by the trial court, but express no opinion as to the evidentiary burden to be imposed on future forfeiture claimants.
[4] However, "the state engineer's decisions in a general adjudication or pursuant to a proposed determination are binding upon the parties unless and until a party files a timely objection to the proposed determination or initiates an independent suit outside of the general adjudication that directly attacks the state engineer's ruling." Green River Canal Co., 2003 UT 50 at ¶ 30, 84 P.3d 1134; see also United States Fuel Co., 2003 UT 49 at ¶ 13, 79 P.3d 945; Utah Code Ann. § 73-4-11 (2003).
[5] On appeal, BCWDC relies on Francis v. Roberts, 73 Utah 98, 272 P. 633 (1928), arguing that it stands for the proposition that "irrigation of indigenous grasses is a beneficial use." BCWDC mischaracterizes the holding in Francis inasmuch as the question at issue in that case was not whether the irrigation of indigenous grasses constituted a beneficial use. Rather, the Francis court was asked to apply a deed granting a party the right to use certain water "before and after the season for irrigating crops." Id. at 634. The court determined only that the grantor's annual irrigation of a meadow for the production of hay constituted irrigation of a crop within the terms of the particular deed at issue. Id.
[6] See In re Escalante Valley Drainage Area, 11 Utah 2d 77, 355 P.2d 64, 66 (1960) (recognizing the irrigation of pasture land for grazing animals as a beneficial type of water use).
[7] We have never expressly adopted the principle of partial forfeiture of water rights, although we have referred to it favorably. See Eskelsen v. Town of Perry, 819 P.2d 770, 775 n. 9 (Utah 1991); Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co., 104 Utah 202, 135 P.2d 108, 112 (1943). The Utah legislature recently revised the Utah Code to specifically provide for partial forfeiture. Utah Code Ann. § 73-1-4 (Supp.2003). The parties do not contend, however, that the revised provisions apply retroactively to this case. See Wash. Nat'l Ins. Co. v. Sherwood Assocs., 795 P.2d 665, 667 (Utah Ct.App.1990) ("[A] statute generally cannot be given retroactive effect unless the legislature expressly declares such an intent in the statute." (citing Utah Code Ann. § 68-3-3 (1986))).
[8] We do not reach the question of whether a finding of partial forfeiture may be grounded in the estimated water consumption of the specific types of plants cultivated by a water user granted water rights for irrigation.