2009 UT 7

**ENCON UTAH, LLC, Plaintiff and Appellee,**

v.

**FLUOR AMES KRAEMER, LLC, Fireman's Fund Insurance Company, and St. Paul Fire and Marine Insurance Company, Defendants and Appellants.**

No. 20070557.

Supreme Court of Utah.

Jan. 27, 2009.

Rehearing Denied June 24, 2009.

Robert F. Babcock, Justin E. Scott, Salt Lake City, Bret Gunnell, Ronald M. Eddy, Denver, CO, for plaintiff.

Bryan H. Booth, Ryan M. Nord, Salt Lake City, for defendants.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶1 Utah Department of Transportation ("UDOT") contracted with Fluor Ames Kraemer, LLC, ("FAK") to construct the Legacy Parkway ("the project"). FAK then

subcontracted with Encon Utah, LLC, ("Encon") to manufacture and install bridge girders for the project. UDOT partially terminated the project, and, as a result, FAK terminated Encon's subcontract. Encon filed suit against FAK and FAK's sureties, Fireman's Fund Insurance Company and St. Paul Fire and Marine Insurance Company, (collectively, "FAK parties") to recover the amounts it claimed it was owed under the termination provision of the subcontract. The FAK parties and Encon filed motions for partial summary judgment regarding the interpretation of that termination provision.

¶ 2 The trial court granted Encon's motion for partial summary judgment and denied the FAK parties' motion. After a four-day bench trial, the court entered judgment in favor of Encon and jointly against the FAK parties, awarding Encon termination damages, prejudgment interest, and attorney fees and costs. In total, the court awarded Encon $1,699,563.50. The FAK parties timely appealed, claiming that the court erred in

(1) applying the termination provision of the subcontract and interpreting that provision such that Encon received an excessive award of compensation for early termination;

(2) awarding Encon $50,000 in claim preparation costs;

(3) awarding Encon prejudgment interest on its termination damages; and

(4) interpreting Utah Code section 63–56–38(4) such that Encon's bond claim was timely filed, and, as a corollary matter, awarding attorney fees based on Encon's bond claim.

## BACKGROUND

¶ 3 In December 2000, UDOT entered into a Design–Build Contract ("prime contract") with FAK to construct the Legacy Parkway. As the general contractor, FAK provided a payment bond for the project; the bond was issued by Fireman's Fund Insurance Company and St. Paul Fire and Marine Insurance Company as co-sureties.

¶ 4 In May 2002, FAK entered into a subcontract with Encon, under which Encon would manufacture, furnish, and install con-crete bridge girders. The total amount Encon was to be paid under the subcontract was $6,842,342.

¶ 5 In April 2003, UDOT partially terminated the prime contract with FAK due to an injunction obtained by an environmental organization enjoining the project's construction. In May 2003, FAK sent Encon a notice of partial termination of the subcontract.

¶ 6 The last work performed by Encon under the subcontract was the hauling and installation of 13 precast concrete girders in March 2004 for which Encon was paid in full in May 2004. Encon filed a complaint in the Third District Court against the FAK parties in September 2004. The complaint asserted a claim for breach of contract and a claim under Utah's payment bond statute.

¶ 7 Encon and the FAK parties filed motions for partial summary judgment regarding the interpretation of the subcontract provision that capped the amount of compensation Encon was entitled to recover for early termination of the project. The court granted Encon's motion for partial summary judgment and denied the FAK parties' motion. Shortly before trial, the FAK parties filed a motion to stay the trial to allow an interlocutory appeal of the summary judgment issues. On the first day of trial, the court denied the motion and directed the parties to proceed with trial. After a four-day bench trial, the court entered judgment in favor of Encon and jointly against the FAK parties, awarding Encon termination damages, prejudgment interest, and attorney fees. The total amount awarded to Encon was $1,699,563.50.

¶ 8 The judgment was made up of three components: (1) termination damages totaling $1,260,778, consisting of compensation for work performed by Encon totaling $1,062,901, and termination costs totaling $197,877; the termination costs included $50,000 in claim preparation costs; (2) prejudgment interest totaling $337,128.30, and (3) attorney fees totaling $101,657.20.

¶ 9 On appeal, the FAK parties challenge each of these components, claiming that the trial court erred in

(1) applying the termination provision of the subcontract and interpreting that provision such that Encon received an excessive award of compensation for early termination;

(2) awarding Encon $50,000 in claim preparation costs;

(3) awarding Encon prejudgment interest on its termination damages; and

(4) interpreting Utah Code section 63–56–38(4) such that Encon's bond claim was timely filed, and, as a corollary matter, awarding attorney fees based on Encon's bond claim.

We affirm each of the trial court's rulings.

¶ 10 We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008).

### STANDARDS OF REVIEW

¶ 11 "We accord a trial court's interpretation of a contract no deference and review it for correctness."[1] We review a trial court's factual findings for clear error and will overturn a factual finding only if it is against "the clear weight of the evidence."[2] A trial court's decision to award "prejudgment interest presents a question of law which we review for correctness."[3] "Matters of statutory construction are questions of law that are reviewed for correctness."[4]

### ANALYSIS

### I. THE TRIAL COURT DID NOT ERR IN APPLYING OR INTERPRETING THE TERMINATION PROVISION OF THE SUBCONTRACT

¶ 12 The FAK parties first claim that the trial court erred in applying and interpreting article 17.3, the termination provision of the subcontract. They claim that the trial court should have instead applied section 15, the

termination provision of the prime contract. They also claim that in interpreting the termination provision of the subcontract, the trial court should have capped Encon's recovery. The FAK parties ask this court to reduce Encon's award by $1,083,335.

¶ 13 We hold that while the prime contract was incorporated into the subcontract, section 15 of the prime contract does not govern the issue of Encon's compensation for early termination of the subcontract. Rather, article 17.3 of the subcontract governs. Additionally, the court correctly applied article 17.3; thus, no reduction in Encon's award is warranted in this regard.

### A. Article 17.3 of the Subcontract Governs Encon's Compensation for Early Termination of the Subcontract

¶ 14 The trial court determined that article 17.3 of the subcontract, entitled "Termination At Company's Option," governed Encon's compensation for early termination. The FAK parties argue that section 15 of the prime contract, entitled "Termination For Convenience," governs because the prime contract was explicitly incorporated into the subcontract.

¶ 15 In interpreting a contract, we look to the language of the document to determine its meaning and the intent of the contracting parties.[5] We also "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none."[6] Where "the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."[7]

1. *Aquagen Int'l, Inc. v. Calrae Trust,* 972 P.2d 411, 413 (Utah 1998).

2. *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989) (internal quotation marks omitted).

3. *Andreason v. Aetna Cas. & Sur. Co.,* 848 P.2d 171, 177 (Utah Ct.App.1993).

4. *Platts v. Parents Helping Parents,* 947 P.2d 658, 661 (Utah 1997).

5. *See Green River Canal Co. v. Thayn,* 2003 UT 50, ¶ 17, 84 P.3d 1134.

6. *Id.* (ellipses in original) (internal quotation marks omitted).

7. *Id.* (internal quotation marks omitted).

¶ 16 The question presented here is whether the language of the subcontract provides that article 17.3 governs the issue of Encon's compensation for early termination. We hold that it plainly does and address the following provisions that inform our decision: (1) section 15 of the prime contract, entitled "Termination For Convenience," (2) article 17.3 of Part III of the subcontract, entitled "Termination At Company's Option," (3) article 2.0 of Part IV of the subcontract, entitled "Incorporation Of The Prime Contract Documents Into The Subcontract," and (4) article 1.0 of Part I of the subcontract, entitled "Description Of Work."

¶ 17 Section 15 of the prime contract, "Termination For Convenience," establishes the right of UDOT to terminate FAK's services at any time as well as FAK's compensation upon such termination. Specifically, subsection 15.1.1 provides that in the event of termination for convenience, FAK may recover "out-of-pocket cost[s]" for work performed, including reasonable overhead, "fair and reasonable" profit on those costs, and reasonable costs occasioned by the termination. Subsection 15.5.3 limits FAK's compensation to "the value of the Work performed."

¶ 18 Article 17.3 of the subcontract, "Termination At Company's Option," establishes a similar right on the part of FAK to terminate Encon's services at any time. It, too, establishes the compensation of Encon upon such termination, providing that Encon may recover actual costs of work performed pre-termination, reasonable overhead and profit on those costs, and reasonable costs occasioned by the termination. It does not, however, limit Encon's recovery to the value of the work performed.

¶ 19 By their terms, these provisions apply to different relationships and establish different termination compensation schemes. Where section 15 applies to UDOT and FAK and limits FAK's recovery to the value of work performed, article 17.3 applies to FAK and Encon and contains no such limitation. Our analysis of which provision governs Encon's compensation for early termination, however, does not end here.

¶ 20 Article 2.0, "Incorporation Of The Prime Contract Documents Into The Subcon-

tract," provides, in pertinent part, that "[t]he [prime] Contract and Appendices thereto, except as specifically excluded, are incorporated in, and made a part of, this Subcontract by reference. Except as specifically excluded below[.]" The language is plain: the prime contract is incorporated into the subcontract in its entirety, except for those sections explicitly excluded. Section 15 is not among the enumerated exclusions. Therefore, section 15 was incorporated into the subcontract.

¶ 21 The FAK parties argue that incorporation of section 15 is determinative. That is, they claim that once incorporated, the provisions of the prime contract govern Encon. This argument ignores the language of Article 1.0.

¶ 22 Article 1.0 of the subcontract, "Description Of Work," provides, in pertinent part, that "[Encon] understands and agrees to comply with the [prime] Contract, *as applicable to the Scope-of-Work* of this [sub-]Contract." (Emphasis added.) Additionally, the "[prime] Contract will govern [Encon] for its Scope-of-Work to the same extent as it governs [FAK], and the term for [FAK] as used in the [prime] Contract will include and refer to [Encon] *where applicable and appropriate.*" (Emphasis added.)

¶ 23 Article 1.0 plainly provides that the prime contract governs Encon only where the provisions of the prime contract relate to Encon's scope of work of manufacturing, delivering, and installing bridge girders. Where the provisions of the prime contract are unrelated to that scope of work, they do not govern. The question then becomes whether section 15 is related to Encon's scope of work such that it governs. It does not.

¶ 24 As the trial court found, section 15 of the prime contract, "Termination For Convenience," is "a commercial contract term unrelated to the scope of defined 'Work' undertaken by Encon on the project." That is, section 15 defines the rights, obligations, and compensation as between UDOT and FAK in the event of FAK's early termination. Encon's defined scope of work of manufacturing, delivering, and installing concrete bridge

girders is entirely unrelated to FAK's negotiated termination provision with UDOT. Thus, while section 15 was incorporated, it does not govern.

¶ 25 The FAK parties contend that this interpretation is flawed because "there would be no reason to incorporate Prime Contract provisions if those provisions were not intended to bind Encon and FAK."

¶ 26 There is, however, a sound business reason to incorporate the provisions of the prime contract into the subcontract wholesale. As Encon points out, incorporating the prime contract ensured that Encon would be subject to and abide by the governing plans and specifications of the agreement between UDOT and FAK. In turn, that ensured that FAK would deliver to UDOT "precisely the Project it … agreed to."

¶ 27 Not every provision incorporated, however, was intended to govern Encon. This is clear from the parties' explicit limitation that Encon would "comply with the [prime] Contract, *as applicable to the Scope-of-Work* of this [sub]Contract." (Emphasis added). UDOT and FAK protected the project's integrity by incorporating the prime contract into the subcontract, but recognizing that not every provision applied to Encon, the parties limited governance of the prime contract to Encon's scope of work. Because section 15 is unrelated to that scope of work, it does not govern.

■ ¶ 28 Contrary to the FAK parties' argument, this interpretation gives effect to each party's explicitly bargained-for rights and harmonizes the provisions by allowing section 15 to govern the termination rights between UDOT and FAK and article 17.3 to govern the termination rights between FAK and Encon. The interpretation urged by the FAK parties would nullify article 17.3, making it wholly superfluous. In interpreting a contract, we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless.[8] The interpretation giving effect to article 17.3 achieves both goals.

¶ 29 The FAK parties also claim that there is a conflict between section 15 of the prime contract and article 17.3 of the subcontract that must be resolved under the order of precedence of documents established in the subcontract. Under that order of precedence, the FAK parties claim that section 15 trumps article 17.3. Because we hold that section 15 applies exclusively to the relationship between UDOT and FAK, and article 17.3 applies exclusively to the relationship between FAK and Encon, there is no conflict in the provisions, and this claim fails.

*B. The Pro Rata Cap in Article 17.3 of the Subcontract Applies Only to the Second Category of Recoverable Costs: Overhead and Profit*

■ ¶ 30 The FAK parties next argue that the trial court erred in applying the pro rata, dollar value cap ("pro rata cap") established in article 17.3 of the subcontract and thus awarded Encon $1,083,335 in excess of the value of the work it actually performed. The FAK parties contend that this result violated article 17.3 and seek to have the judgment reduced to reflect their interpretation of the proper amount due Encon. Because the court applied the pro rata cap correctly, no reduction in the award is warranted.

¶ 31 In calculating Encon's compensation, the court reviewed the terms of article 17.3, which provide that in the event of Encon's termination for convenience, it may recover

the actual costs of all such Work satisfactorily executed to the date of termination, plus an allowance for reasonable overhead and profit on such costs incurred prior to termination (but not to exceed a pro rata portion of such Contract Price for such Work based on the percentage of Work properly completed to the date of termination), together with reasonable costs occasioned by such termination and not previously paid for, less such sums as [Encon] has already received on account of the Work performed. In no event shall total payment to [Encon] exceed the Contract Price [of $6,842,342].

¶ 32 There are three categories of recovery established in article 17.3: (1) actual costs of

---

8. *See Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 2004 UT 54, ¶ 11, 94 P.3d 292.

work performed pre-termination, (2) reasonable overhead and profit on those costs, and (3) reasonable costs occasioned by the termination.

¶ 33 There are also two caps on recovery: (1) pursuant to the last sentence of section 17.3, Encon's total recovery could not exceed the contract price and (2) pursuant to the pro rata cap in the parenthetical, Encon's overhead and profit component was limited.

¶ 34 The trial court determined, as to each category, what Encon was entitled to recover, applied the pro rata cap to the second category—overhead and profit—and awarded Encon the following: (1) $1,815,945 in actual costs, (2) $2,134,331 in overhead and profit, and (3) $197,877 in termination costs. The court then subtracted the total payments Encon received from FAK under the subcontract ($2,887,375) and awarded Encon $1,260,778 in termination compensation.

¶ 35 The FAK parties claim that the pro rata cap applies not only to the second category of costs—overhead and profit—but to the first category as well—actual costs. Under this approach, the FAK parties contend that the trial court should have limited, or "capped," Encon's entire recovery at $2,866,941. They claim that $2,866,941 represents the total value of the work Encon actually performed and that under article 17.3, Encon was entitled to recover no more.

¶ 36 The FAK parties' argument rests not on the language, grammar, or punctuation of article 17.3, but on their claim that section 15 of the prime contract governs this issue. They point to subsection 15.5.3 of the prime contract, which explicitly provides that in no instance shall "compensation [exceed] . . . the value of the Work performed." Though article 17.3 contains no similar limitation, the FAK parties claim that "[a]t its essence, the pro rata [cap, when applied to the first and second category of costs,] is the contract value of the work performed prior to termination." Thus, they argue, "[article] 17.3

imposes the same ceiling that is imposed by [s]ection 15."

¶ 37 The FAK parties' argument fails for two reasons. First, section 15, though incorporated, does not govern Encon's compensation for early termination. Therefore, the limitation on recovering only the value of the work performed as established in section 15 of the prime contract has no bearing on the interpretation of article 17.3 of the subcontract. Second, the language, grammatical structure, and punctuation of article 17.3 demonstrate that the pro rata cap applies only to the second category of costs—overhead and profit.

¶ 38 Proper contract interpretation includes "application of ordinary rules of grammar." [9] Here, the pro rata cap appears in a sentence that contains three phrases. Each phrase is set off by commas. The second phrase contains a parenthetical, and that parenthetical contains the pro rata cap. Encon argues that, based on the grammatical structure of article 17.3, the pro rata cap "should be applied only to the phrase in which the language appears." They cite *Goetz v. American Reliable Insurance Co.*[10] as support for their claim that rules of grammar and punctuation can inform and dictate contract interpretation.

¶ 39 In *Goetz*, the court of appeals interpreted an insurance policy that contained three clauses set off by commas. In relevant part, the policy provided that maximum recovery was fixed "[i]f an eligible injured person who is a named insured, a relative, or person who is injured in an accident involving the use of an insured motor vehicle, has other similar insurance applicable to the accident . . . ."[11]

¶ 40 The court of appeals found that the provision unambiguously fixed the maximum insurance recovery in three situations: when the injured person (1) is a named insured, (2) is a relative, and (3) is injured in an accident *involving an insured motor vehicle.*[12] The appellant argued that the emphasized lan-

9. *United States v. Werner,* 317 F.3d 1168, 1173 (10th Cir.2003).

10. 844 P.2d 366 (Utah Ct.App.1992).

11. *Id.* at 367.

12. *Id.* at 370 (emphasis added).

guage applied to all three categories, but the court found such an interpretation "flawed because of grammatical oversight."[13] The court noted that "clearly, given normal rules of punctuation, the clause is only part of (3)."[14]

¶ 41 Similarly, in article 17.3, there are three categories of costs, each set off by commas. The pro rata language appears solely within a parenthetical phrase, which in turn, is included solely within the second category of costs. Normal rules of punctuation dictate that the parenthetical applies only to the phrase to which it is attached.[15] The trial court correctly found the same: "[B]ased on the plain meaning and punctuation of [article] 17.3 ... the pro rata limitation in the parenthetical clause modifies only the preceding term, 'an allowance for reasonable overhead and profit on such costs incurred prior to termination' and therefore applies only to the calculation of overhead and profit."

¶ 42 The FAK parties next assert that this interpretation is incorrect because the pro rata cap could never be triggered and therefore is not meaningful. That is not the case. Any finding of less than 31% completion by Encon, in fact, would have triggered the pro rata cap.[16]

¶ 43 Based on the foregoing discussion, we affirm the trial court's decisions that article 17.3 governs Encon's compensation for early termination, the pro rata cap applies only to the second category of recoverable costs, and the prime contract's limitation on recovering only the value of the work performed does not apply to Encon. Therefore, no reduction in Encon's award is warranted.

## II. THE TRIAL COURT'S DECISION TO AWARD $50,000 IN CLAIM PREPARATION COSTS WAS NOT CLEARLY ERRONEOUS

¶ 44 The FAK parties next argue that the trial court erred in "award[ing] the full $50,000 in claim preparation costs" that Encon requested. In its findings of fact and conclusions of law, the trial court found that Encon incurred "$197,877 in costs occasioned by the termination ... [which] consists [in part] of $50,000 in claim preparation costs."

¶ 45 The FAK parties claim that the court's award was against the clear weight of evidence because "even when all the relevant evidence is marshaled and viewed in the light most favorable to the trial court's ruling, the evidence is not legally sufficient to support a finding of $50,000 in claim preparation costs." However, the FAK parties fail to satisfy their burden of marshaling the evidence.

¶ 46 "To successfully attack a trial court's findings of fact, an appellant must first marshal all the evidence in support of the findings and then demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings...."[17] The FAK parties provide an addendum of transcript and exhibit excerpts that they claim is the full spectrum of evidence supporting the trial court's award. They do not, however, explain or demonstrate how that evidence, when viewed in the light most favorable to the trial court's ruling, is insufficient. An addendum of excerpts without explanation does not "demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings."[18]

13. *Id.*

14. *Id.*

15. *See Petersen v. Ogden Union Ry. & Depot Co.*, 110 Utah 573, 175 P.2d 744, 750 (1946) (Larson, J., concurring in result) (explaining that a clause set off by commas "is to be treated as one thought and clause").

16. Initially, FAK argued that Encon had not completed more than 30% of the project when it terminated Encon's services. Using 31% completion—or any percentage under 31%—where the pro rata cap applies only to the second category of overhead and profit, the cap would have been triggered. For example, 31% of $6,842,342 equals $2,121,126. That amount is lower than the total value of overhead and profit Encon was seeking ($2,134,331) and would have triggered the cap.

17. *Ockey v. Lehmer*, 2008 UT 37, ¶ 34 n. 32, 189 P.3d 51 (internal quotation marks omitted).

18. *Id.*

¶ 47 The FAK parties do, however, discuss a single excerpt of testimony in their brief. They cite the testimony of Mark Helseth, Encon's expert, in which Helseth testified that the $50,000 figure for claim preparation was included "for analysis sake." While this testimony, standing alone, likely would be inadequate to support the court's award, the FAK parties fail to marshal the evidence that was provided by their expert on the point of Encon's claim preparation costs.

¶ 48 In his testimony, the FAK parties' expert, Michael Ray, agreed that "there [was nothing] wrong with th[e] numbers" Encon presented as part of its termination proposal and that $50,000 in claim preparation costs was "appropriate." The FAK parties did not include this testimony as an excerpt in their addendum, nor did they include it in their brief with the required explanation of why, when viewed in the light most favorable to the trial court's decision, the testimony is insufficient to support that decision.[19]

¶ 49 Because the FAK parties have failed to meet their burden of marshaling the evidence, they cannot demonstrate, and are precluded from arguing, that the trial court's decision to award Encon $50,000 in claim preparation costs was clearly erroneous.

## III. THE TRIAL COURT DID NOT ERR IN AWARDING PREJUDG-MENT INTEREST TO ENCON

¶ 50 The FAK parties next argue that the trial court erred in awarding prejudgment interest to Encon.[20] They claim that Encon's damages were not ascertainable to a "mathematical certainty," which is, they claim, a prerequisite to recovering prejudgment interest. The FAK parties raise three related arguments as support: (1) Encon could not determine its own damages with consistency, (2) the trial court had to use its "best judgment" in determining Encon's damages, and (3) the trial court had to determine the reasonableness of the overhead and profit amounts that Encon claimed it was due. None of these arguments is persuasive.

¶ 51 "Prejudgment interest may be recovered where the damage is complete, the amount of the loss is fixed as of a particular time, and the loss is measurable by facts and figures."[21] Prejudgment interest is appropriate when "the loss ha[s] been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages."[22] The trial court adopted a semblance of this language, ruling that prejudgment interest was appropriate because Encon's damages were "subject to mathematical calculation."

¶ 52 Each of these iterations of the standard for recovering prejudgment interest is correct. None suggests or requires, as the FAK parties claim, that at the time the damages accrued, all of the damage figures must be known and remain static throughout the litigation. Rather, the standard focuses on the measurability and calculability of the damages.

¶ 53 The court of appeals has explained that "losses that cannot be calculated with mathematical accuracy are *those in which damage amounts are to be determined by the broad discretion of the trier of fact,* such as in cases of personal injury, wrongful death, defamation of character, and false imprisonment."[23] Thus, prejudgment interest

19. In their reply brief, the FAK parties claim that Ray's testimony "did not establish Encon's award of claim preparation costs," only that he testified that it was an "appropriate category of costs." When directly asked whether $50,000 in claim preparation costs was appropriate, however, Ray responded, "that's appropriate." Thus, the FAK parties have not demonstrated that all reasonable inferences drawn from Ray's testimony fail to support the trial court's award.

20. The trial court determined that prejudgment interest was appropriate under Utah Code section 15–1–1 "and that interest accrues at 10% per annum from September 15, 2004 ... through March 15, 2007" with "a per diem rate of $345.42" for a total award of $314,676.

21. *Saleh v. Farmers Ins. Exch.,* 2006 UT 20, ¶ 28, 133 P.3d 428.

22. *Bellon v. Malnar,* 808 P.2d 1089, 1097 (Utah 1991).

23. *Bennett v. Huish,* 2007 UT App 19, ¶ 45, 155 P.3d 917 (emphasis added); *see also Fell v. Union Pac. Ry. Co.,* 32 Utah 101, 88 P. 1003, 1006 (1907) (Establishing the standard for prejudg-

is inappropriate in cases where the trier of fact is left to assess damages based on "a mere description of the wrongs done or injuries inflicted." [24]

¶ 54 We have held that prejudgment interest is appropriate in cases where the "amount due under [a] contract was ascertainable by calculation and it was only the method to be used in making the calculation that was uncertain." [25]

¶ 55 Therefore, where damage figures must be determined by the trier of fact in its exercise of discretion, prejudgment interest is inappropriate. Where damage figures are subject to calculation, however, even if the method of calculating is uncertain, or the damage figures change, prejudgment interest is appropriate. The trial court recognized this important distinction and noted that, "although various elements of Encon's termination claim may have been disputed as to amount, the claim has been subject to mathematical calculation since the date it was submitted." The trial court was correct.

### A. Encon Did Assert a Sufficiently Consistent Damage Claim

¶ 56 First, the FAK parties contend that Encon "repeatedly changed the amount of its claim, including a final revision on the third day of trial," and thus, the damage claim was not "calculable with mathematical certainty," and the trial court erred in awarding prejudgment interest to Encon.

¶ 57 This argument is not persuasive because, as noted by Encon, most of the changes Encon made to its damage figures preceded the date on which the trial court began calculating prejudgment interest. The only change to Encon's claimed damages after the date from which the trial court began its calculation of prejudgment interest on September 15, 2004, was a change made on March 14, 2004, when Encon made "a voluntary reduction in the amount [of damages] to reflect the evidence at trial."

¶ 58 Citing this court's holding, the court of appeals has held, "[t]he fact that the parties dispute or reduce the amount of damages does not in and of itself mean that damages are incomplete or cannot be calculated with mathematical accuracy." [26] We agree and recognize that a single voluntary reduction in claimed damages during trial does not preclude those damages from being measurable or calculable.

¶ 59 The FAK parties cite two cases as support for the proposition that when the party claiming prejudgment interest cannot establish "its damages consistently during the period before trial, ... such damages [are] not 'calculable within a mathematical certainty.'" [27] In the cases cited, however, damages could not be calculated with *any* degree of certainty, in part, because of the inherently speculative nature of some of the damages sought. Both cases involved plaintiffs seeking recovery, at least in part, of future lost profits. In *Pro Axess*, for example, Pro Axess sought damages for parts purchased, travel expenses, and *unrealized gross profits*.[28] The Tenth Circuit found that Pro Axess "submitted virtually no evidence" to support its claim that it was due damages based on a "35% gross profit margin." [29] Noting the absence of evidence as well as

---

ment interest by explaining that it should not be awarded in cases where the fact finder must determine damages by exercising its broad discretion. We listed, for example, "all personal injury cases, cases of death by wrongful act, libel, slander, false imprisonment, malicious prosecution, assault and battery, and all cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of the trial."); *Shoreline Dev. v. Utah County*, 835 P.2d 207, 211 (Utah Ct.App.1992) ("If the jury must determine the loss by using its best judgment as to valuation rather than fixed standards of valuation, prejudgment interest is inappropriate.").

**24.** *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 22, 82 P.3d 1064.

**25.** *Jack B. Parson Constr. Co. v. State*, 552 P.2d 107, 109 (Utah 1976).

**26.** *Bennett*, 2007 UT App 19, ¶ 45, 155 P.3d 917 (citing *Fairfax Realty*, 2003 UT 41, ¶ 23, 82 P.3d 1064).

**27.** Quoting *Pro Axess, Inc. v. Orlux Distrib.*, 428 F.3d 1270, 1283 (10th Cir.2005).

**28.** *Id.* at 1283 n. 12 (emphasis added).

**29.** *Id.* at 1283.

"Utah courts' reluctance to award prejudgment interest for unrealized profits," the Tenth Circuit denied Pro Axess's claim for prejudgment interest.[30]

¶ 60 Here, Encon seeks recovery of damages for a completed percentage of work on a fixed-price contract and for profits on that work at a rate of 10%.[31] At trial, the FAK parties' expert agreed that 10% was a reasonable profit margin. Thus, the profits Encon seeks are known, calculable figures and are not similar to the speculative future profits that were at issue in *Pro Axess.*

¶ 61 Given that a reduction in the amount of damages does not necessarily, and did not in this case, infringe the court's ability to subject those damage figures to mathematical calculation, the FAK parties' first argument as to prejudgment interest fails.

## B. The Trial Court's Ultimate Determination of Damages Does Not Preclude an Award of Prejudgment Interest

¶ 62 The FAK parties next present two related arguments: Encon's damages were not subject to mathematical calculation because (a) the trial court "was required to use its best judgment in choosing between conflicting expert testimony" on the issue of damages, and (b) the trial court "was required to determine [the] reasonableness of overhead and profit."

¶ 63 The FAK parties contend that because the trial court had to determine each of several cost categories based on conflicting expert testimony, the court "necessarily used its best judgment to decide between competing expert testimony." Citing a case from this court, *Cornia v. Wilcox,*[32] the FAK parties argue that when a court exercises its discretion to determine which expert's valuation of damages to apply, prejudgment interest is inappropriate.

¶ 64 A dispute, even between experts, as to the precise amount of damages does not necessarily preclude those damages from being measurable or calculable.[33] Additionally, *Cornia* is inapposite. *Cornia* is a bailment case in which competing experts disputed how missing cows, the product on which damages were based, were valued. We upheld the trial court's refusal to award prejudgment interest because "[w]ithout any clear factual information, plaintiffs' damages could not be measured by facts and figures or [be] calculated with mathematical accuracy."[34] In that case, we highlighted the conflicting and divergent evidence regarding damages and the speculative nature of the damages sought:

> [T]he jury heard conflicting testimony from experts regarding the cattle's expected pregnancy rates, weight range, loss rates, and market prices. In addition, the jury heard divergent evidence regarding the calves' expected gender, weight range, mortality rates, and market prices. Plaintiffs could not establish these elements as a matter of fact, and thus the jury was free to use its best judgment in ascertaining and assessing the damages.[35]

---

30. *Id.* at 1283, 1284. Similarly, in *Anesthesiologists Associates v. St. Benedict's Hospital,* also cited by the FAK parties as support, the Association sought several types of damages, among them lost future profits. On this point, the court of appeals held that "[g]iven the uncertainty inherent in predicting lost future profits in this case, we affirm the trial court's denial of prejudgment interest." 852 P.2d 1030, 1042 (Utah Ct.App.1993), *rev'd on other grounds,* 884 P.2d 1236 (Utah 1994). The court of appeals further explained that "the very nature of lost future profits injects an air of uncertainty and speculation into the calculation of damages." *Id.*

31. The parties agreed that Encon completed 41.9% of the contract work. The trial court determined the value of that work by multiplying the contract price of $6,842,342 by 41.9% for a total of $2,866,941.

32. 898 P.2d 1379 (Utah 1995).

33. *See Fairfax Realty,* 2003 UT 41, ¶ 23, 82 P.3d 1064 ("The fact that the parties disputed the value of the property at trial does not change our conclusion that the jury's determination of the property's value was ascertained ... in accordance with fixed rules of evidence and known standards of value. Therefore, we uphold the trial court's decision to award prejudgment interest." (alteration in original) (citation and internal quotation marks omitted)).

34. *Cornia,* 898 P.2d at 1387 (internal quotation marks omitted).

35. *Id.*

¶ 65 In this case, the court was not left to its best judgment to ascertain damages. Rather, the court reviewed the terms of Encon's fixed price contract, the percentage of work Encon completed, and noted that the parties agreed that 10% profit on that work was reasonable. Thus, the court based its final decision on measurable facts and figures. Exercising its discretion to determine which expert's valuation was more accurate does not present the same concern we raised in *Cornia*, where the fact finder, "[w]ithout any clear factual information," was left solely to its discretion to determine damages.[36]

¶ 66 The FAK parties' final argument is similarly flawed. They claim that because the trial court determined the reasonableness of Encon's overhead and profit, the claim was not subject to mathematical calculation. Recently, the court of appeals has addressed the issue of a trial court's reduction in damages and held that "[a]lthough the trial court determined which costs to include and which to exclude, this determination did not render the resulting damage award less measurable by facts and figures."[37] Similarly, the trial court's single reduction in the amount of damages it awarded Encon did not render those damages less measurable by facts and figures.

¶ 67 Additionally, we note that the purpose of awarding prejudgment interest is "to compensate a party for the depreciating value of the amount owed over time and, as a corollary, to deter parties from intentionally withholding an amount that is liquidated and owing."[38] A party can only be properly compensated for the "value of the amount owed over time" if the amount owed is subject to mathematical calculation. This does not require, however, that a party must demonstrate that its damage figures are known and static from the date the claim is filed through the final judgment.

¶ 68 Were we to hold that the damage figures could never change, we would foreclose the possibility of awarding prejudgment interest in nearly every case. As Encon points out, a prevailing party could only recover under the FAK parties' standard if a prevailing party never changed its claimed damages, no aspect of the damages calculation was disputed at trial, and the court awarded the entire claim without reduction or adjustment. This result does not serve the policy underlying the availability of prejudgment interest nor is it consistent with our standard that damages be measurable by facts and figures.

¶ 69 Because Encon demonstrated that its damages were measurable by facts and figures, and the FAK parties' arguments do not convince us otherwise, the trial court correctly awarded prejudgment interest to Encon.

## IV. THE TRIAL COURT DID NOT ERR IN DEEMING ENCON'S BOND CLAIM TIMELY AND THEREFORE DID NOT ERR IN AWARDING ATTORNEY FEES

¶ 70 The FAK parties' final argument is that the trial court erred in interpreting Utah Code section 63G–6–505(5) (2008), the payment bond statute.[39] The court concluded that Encon's bond was timely under the statute because "subsection [5] ... require[s] only that an action upon a payment bond be brought within one year after the last work performed by the claimant regardless of whether the claimant was paid in full for that last work prior to the commencement of the action." The FAK parties claim that, under

---

36. *Id.*

37. *Crowley v. Black*, 2007 UT App 245, ¶ 9, 167 P.3d 1087 (internal quotation marks omitted) (explaining the trial court's determination of damages as follows: "[T]he trial court determined appropriate damages from lost rent and the cost of repairs by calculating known amounts and identifying clear dates.... The trial court reduced the damages sought for lost rent from one month to half a month,.... The court attributed most of the repair costs to damage caused by Defendant. The court did, however, reduce the damages sought by designating certain repairs as either normal wear and tear or as repairs resulting from Plaintiff's own failure to maintain the property." *Id.* ¶ 8.)

38. *Carlson Distrib. Co. v. Salt Lake Brewing Co.*, 2004 UT App 227, ¶ 32, 95 P.3d 1171 (citation omitted).

39. Section 63G–6–505(5) was previously numbered 63–56–38(4). Because there are no substantive changes we refer to the current statute.

the correct interpretation, "Encon's payment bond claim was filed after the expiration of the applicable statute of limitations, [and] the trial court erred in awarding judgment under the payment bond claim." Because the trial court awarded attorney fees based on the bond, the FAK parties seek a reversal of that award as well.

¶ 71 Section 63G–6–505(5) provides, in pertinent part, that "[a]n action upon a payment bond ... is barred if not commenced within one year after the last day on which the claimant performed the labor or service or supplied the equipment or material *on which the claim is based.*" (Emphasis added.) The FAK parties cite the emphasized language and argue that it refers not only to the last work performed, but to the "last work for which the claimant *seeks to recover payment.*" (Emphasis added.)

¶ 72 The FAK parties' argument rests on the 1989 amendment to the statute, which added the phrase, "on which the claim is based." [40] They argue that this addition "made a significant change to the limitations analysis under the ... payment bond statute," namely that the one-year period begins "the day the claimant performs the last work for which the claimant seeks to recover payment." That is, the statute of limitations begins running on the day of the last *unpaid work* for which the contractor seeks recovery. Encon performed its last work on the project in March 2004. It was paid in full for that work on May 7, 2004. Encon filed its bond claim in September 2004, six months after its last completed work on the project. Because Encon was paid for its March 2004 work, the FAK parties claim that it cannot use that date as the beginning of the limitations period. Rather, they claim that the limitations period began running in July 2003, the date of Encon's last unpaid work. Using that date, the limitations period ended in July 2004, making Encon's claim, filed in September 2004, untimely. The FAK parties' interpretation fails.

¶ 73 When "statutory language plausibly presents the court with two alternative readings, we prefer the reading that avoids absurd results." [41] The FAK parties' interpretation not only creates an absurd result, it invites confusion, piecemeal litigation, a waste of judicial resources, and gamesmanship in the payment of claims.

¶ 74 In the common scenario where a contractor pays multiple invoices to a subcontractor on a single project, that subcontractor would be subject to multiple statute of limitation periods for unpaid work. If the subcontractor performed work in each of the twelve months of the year and was paid for that work monthly, a different statute of limitations would attach to each month's work. This is not only an absurd result, it would create confusion among the parties as to when the statute of limitations began and ended for each claim, and it would mandate piecemeal litigation to resolve each of those claims. Additionally, given that money is fungible, this result would create an unworkable standard and waste judicial resources by forcing courts to determine which monies applied to which invoices for the purpose of determining when the statute of limitations began.

¶ 75 Finally, this result invites gamesmanship. Using the same example, if the contractor failed to pay the subcontractor multiple invoices for several different months of work, the contractor could avoid a claim on the bond by strategically paying the latest invoice rather than the earliest. It is highly unlikely that this is the result the legislature intended by adding the phrase, "on which the claim is based."

¶ 76 The FAK parties have provided no legislative history to support their interpretation, nor have they cited any case in which a court has applied the statute according to their interpretation. To the contrary, a search of Utah case law reveals that not a single court has applied the statute, since the

---

**40.** In 1987, the payment bond statute provided that "[n]o suit may be commenced after the expiration of one year after the day on which the last of the labor was performed or material was supplied by the person bringing the suit." Utah Code Ann. § 63–56–38(4) (1987). The 1989 amendment changed the wording slightly and added the phrase, "on which the claim is based." *Id.* (1989).

**41.** *State ex rel. Z.C.,* 2007 UT 54, ¶ 15 n. 5, 165 P.3d 1206.

1989 amendment, according to the FAK parties' interpretation.[42]

¶ 77 There is nothing in the language of the statute, legislative history, or the nearly twenty years of case law following the revision to suggest that the FAK parties' interpretation is correct. Construing the statute according to the FAK parties' interpretation would create an absurd result, invite confusion, piecemeal litigation, a waste of judicial resources, and gamesmanship. Therefore, the trial court did not err in concluding that Encon's bond was timely. Accordingly, the trial court did not err in awarding attorney fees to Encon based on the payment bond.

## CONCLUSION

¶ 78 The FAK parties argue that the trial court erred in (1) applying the termination provision of the subcontract rather than the prime contract and interpreting the pro rata cap as applying only to overhead and profit; (2) awarding Encon $50,000 in claim preparation costs; (3) awarding Encon prejudgment interest; and (4) interpreting the statute of limitations in the payment bond statute.

¶ 79 We affirm each of the trial court's decisions and hold that (1) the termination provision of the subcontract governs Encon's termination compensation and the pro rata cap applies only to overhead and profit; (2) Encon's award of $50,000 in claim preparation costs was not clearly erroneous given that the FAK parties failed their burden of marshaling the evidence; (3) Encon was entitled to prejudgment interest because its claim was measurable by facts and figures; and (4) the statute of limitations in Utah's payment bond statute is not dependent on the date of the claimant's last unpaid work.

¶ 80 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT'S opinion.

---

42. The FAK parties cite only one Fourth Circuit case from 1970 as support for their interpretation of Utah's payment bond statute. The case cited, however, is inapposite: it interprets the 90–day notice provision of the federal Miller Act, the law requiring contract surety bonds on federal construction projects.